*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0040p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

HAVENSURE, L.L.C.,

        *Plaintiff-Appellant,*

    *v.*

No. 09-3367

PRUDENTIAL INSURANCE COMPANY OF
AMERICA,

        *Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 06-00721—Sandra S. Beckwith, District Judge.

Argued: January 12, 2010

Decided and Filed: February 12, 2010

Before: MARTIN, BOGGS, and WHITE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Robert R. Sparks, PARRY, DEERING, FUTSCHER & SPARKS, PSC, Covington, Kentucky, for Appellant. Michael Nathan Ungar, ULMER & BERNE, LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Robert R. Sparks, PARRY, DEERING, FUTSCHER & SPARKS, PSC, Covington, Kentucky, for Appellant. Michael Nathan Ungar, Gregory James Phillips, Paula Gallito Shakelton, ULMER & BERNE, LLP, Cleveland, Ohio, Jeffrey S. Jacobson, DEBEVOISE & PLIMPTON, New York, New York, for Appellee.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge. Havensure, L.L.C. (Havensure), an insurance broker, sued Prudential Insurance Company of America (Prudential), an insurer, for tortious interference with Havensure's business relationship with York International Corp. (York). Havensure claimed that Prudential offered York a better rate quote through Havensure's competitor than

1

through Havensure in order to prevent Havensure from winning York's business. The district court granted summary judgment in favor of Prudential. On appeal, Havensure asserts that the district court erred in two ways: first, it wrongly concluded that Havensure failed to raise a genuine issue of material fact with respect to the cause of its alleged injury; second, the district court erroneously found that Prudential's interference was privileged as a matter of Ohio law. Upon de novo review, we agree with the district court that Prudential's interference was privileged as a matter of Ohio law, and thus we affirm the district court's judgment. Because privilege provides sufficient grounds to affirm the district court's judgment, we do not examine the issue of causation.

## I

In early 2004, Havensure approached York with a proposal for obtaining group life insurance and disability insurance through a "group purchasing organization." At the time, York's broker of record was Universal Life Resources (ULR), and its group life insurance carrier was Prudential.

After meeting with Havensure and Corporate United (a group purchasing organization), York issued Havensure a Letter of Authorization that enabled Havensure to obtain confidential information from Prudential regarding York's group life insurance plan. Upon reviewing this information, Havensure projected that it could save York $125,000 per year on group life insurance and $93,500 per year on long-term disability insurance. Part of this savings apparently arose from the elimination of $135,000 in hidden broker fees built into York's existing plan.[1]

After reviewing Havensure's projections, York authorized Havensure to send out a Request for Proposals (RFP). On May 25, 2004, Havensure sent an RFP to various insurance carriers, including Prudential.

Havensure's RFP sparked discussion at Prudential. On June 3, Prudential executive Lori High e-mailed several colleagues and expressed uncertainty as to how to

---

[1]The parties dispute whether these fees were actually known to York. For the purpose of summary judgment, we will assume that the fees were hidden.

respond to Havensure's RFP.  In a written response to High's e-mail, Prudential executive Daniel Hettrich strongly supported the incumbent broker (i.e., ULR).  He gave three justifications for his position.  First, he did not believe that incumbent carriers (like Prudential) fared well when a client granted a Letter of Authorization to a new broker, and he believed that Prudential would "most likely lose business when a [Letter of Authorization] is received."  In light of Havensure's receipt of a Letter of Authorization, Hettrich believed that it was critical to support the incumbent broker throughout the bidding process in order to preserve Prudential's existing relationship with York. Second, Hettrich noted that he did not understand Havensure's business model, and found that it failed to produce the results (mutually benefitting the client, the broker, and Prudential) that Prudential preferred.  Finally, he asserted that Prudential needed "to stand with the broker/consultant that brought us to the dance."

Despite Prudential's apparent reluctance to deal with Havensure, on June 28, 2004, Prudential produced a quote for Havensure.  This bid was identical to the current York plan, except that it removed the $135,000 in hidden fees and added Havensure's 4% commission rate.

At the close of the bidding process, Havensure presented its results to York.  The lowest bidder was not Prudential; rather, CIGNA submitted a bid that was $90,020 less per year than the lowest quote provided by Prudential.  York did not provide an immediate response to these results.  Instead, York's Manager of Worldwide Benefits, Wendy Nafziger, shared both Prudential and CIGNA's bids with ULR, "with the intention that ULR would pursue negotiations with Prudential based on that information."

On September 7, 2004, ULR sent an e-mail to Prudential executives indicating that both ULR's and Prudential's positions were in jeopardy because of CIGNA's rate quote.  Prudential responded by matching CIGNA's bid, but it made this lower bid available *only through ULR*.  Prudential executive Frank Corsi explained Prudential's decision to match CIGNA's bid:

This case is running a 42% loss ratio[2] and in the end the only reason I landed on making this concession was to support [ULR] and to be honest, try to prevent Havensure from winning this account.

After receiving Prudential's reduced bid through ULR, York decided to remain with Prudential and ULR. York informed Havensure and Corporate United that it had decided not to accept any of the bids obtained by Havensure.

On October 26, 2006, Havensure filed the present action against Prudential in the United States District Court for the Southern District of Ohio. In its second amended complaint, Havensure alleged that Prudential violated the Sherman Antitrust Act, tortiously interfered with Havensure's business relationship with York, committed civil conspiracy, and had been unjustly enriched. The district court dismissed Prudential's antitrust and unjust enrichment theories for failure to state a claim, and Havensure has not appealed that ruling. After discovery, the district court granted summary judgment in favor of Prudential on Havensure's remaining tortious interference and conspiracy claims. The court held that Havensure had failed to provide evidence indicating that Prudential's interference actually caused York to sever its relationship with Havensure and also held that Prudential's interference was privileged as a matter of Ohio law. As no predicate tort remained to support Havensure's civil conspiracy claim, the district court also granted summary judgment against Havensure on that claim. Havensure timely appealed.

## II

On appeal, Havensure challenges the grounds upon which the district court granted summary judgment. This court reviews a district court's order granting summary judgment de novo. *Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

---

[2]In the parlance of the insurance industry, a 42% loss ratio indicates that an account is highly profitable.

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389-90 (6th Cir. 2008) (citing *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). Once the moving party has satisfied its burden, the nonmoving party may not rest upon its mere allegations or denials of the opposing party's pleadings, but rather it must set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, this court draws all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Reviewing the district court's judgment under this standard, we hold that the district court did not err when it granted summary judgment on Havensure's tortious interference claim. Under Ohio law, a claim for tortious interference with a business relationship arises when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). As this definition suggests, interference with a business relationship is not tortious if the interference is privileged.[3] *See Reali, Giampetro & Scott v. Soc'y Nat'l Bank*, 729 N.E.2d 1259, 1267 (Ohio App. 1999). The Ohio Supreme Court has adopted the approach of the Restatement (Second) of Torts in determining whether an interference is privileged. *See Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999). Under that approach, a court must consider seven factors:

---

[3]Ohio courts appear to use the terms "privileged," "justified," and "proper" interchangeably. *See, e.g.*, *Wauseon Plaza L.P. v. Wauseon Hardware Co.*, 807 N.E.2d 953, 963 (Ohio App. 2004); *Doyle v. Fairfield Mach. Co.*, 697 N.E.2d 667, 683 (Ohio App. 1997).

(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Ibid.* (citing Restatement (Second) of Torts § 767). Ohio courts place the burden on the plaintiff to show that the defendant's conduct was not privileged. *See Doyle v. Fairfield Mach. Co.*, 697 N.E.2d 667, 683 (Ohio App. 1997) (citing *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995)); *see also Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 742 (6th Cir. 1999) (citing *Kenty*, 650 N.E.2d at 866).

Applying Ohio's seven-factor test to the present case, we conclude that the district court was correct that there is no genuine issue of material fact as to whether Prudential's actions in seeking to retain York's business through ULR rather than Havensure were privileged. Looking first to the nature of Prudential's conduct in supplying ULR with a lower quote, Prudential did nothing that was independently criminal, tortious, or even wrongful. Generally speaking, absent antitrust concerns, "there exists no duty to deal." *Byars v. Bluff City News Co.*, 609 F.2d 843, 854 (6th Cir. 1979). The district court concluded that Prudential's alleged conduct did not amount to an antitrust violation, and Havensure has not challenged that ruling. Further, Havensure has identified no federal or state law that prohibited Prudential from offering a lower rate quote through ULR than it did through Havensure.

Havensure does suggest that Prudential used fraud or misrepresentation to accomplish its interference, based upon an e-mail composed by Prudential Senior Vice President Michael Witwer. Appellant's Brief at 25. Havensure asserts that this e-mail misrepresented the nature of the bid that Prudential submitted to Havensure. *Ibid.* Yet Witwer addressed his e-mail only to ULR employees, and there is no evidence that York employees ever received the e-mail or learned of its contents. In fact, York's Manager of Worldwide Benefits specifically disclaimed any recollection of the e-mail. There is

thus no evidence that Prudential used fraud or misrepresentation to dissuade York from dealing with insurers through Havensure.

Havensure also suggests that Prudential used "illegal means" because it included hidden broker compensation in the plan that it originally provided to York. Appellant's Reply Brief at 13. Yet, even if such conduct was illegal, it has no bearing upon the present inquiry. Havensure does not explain, nor is it apparent, how Prudential's inclusion of hidden compensation to ULR in the original York plan interfered with Havensure's potential contract with York. If anything, the inflated price of the original York plan increased Havensure's chance of winning York's business. In fact, Havensure identifies the *removal* of the hidden compensation as hurting its relationship with York. *Id.* at 14. Nor does Havensure assert that Prudential's removal of the hidden compensation was a means to protect the allegedly unlawful compensation scheme. In short, although the allegedly hidden broker compensation might have been illegal,[4] its inclusion in the original York-Prudential benefit plan was not the means used to thwart Havensure's efforts, and removing the compensation was not illegal.

Finally, Havensure alleges that Prudential violated its own internal policies and that this violation suffices to render Prudential's conduct wrongful. Appellant's Brief at 23-24. This argument has no legal basis. Although violations of "recognized ethical codes" or "established customs or practices" may be significant in evaluating the nature of an actor's conduct, *see* Restatement (Second) of Torts § 767 cmt c.; *see also Fred Siegel Co.*, 707 N.E.2d at 860 (citing the Restatement), Havensure has identified no authority suggesting that a violation of internal policies has comparable significance.

Turning from Prudential's conduct to its motive, the record establishes that Prudential's desire to prevent Havensure from becoming York's broker was coincident

---

[4]We stress the qualified nature of this statement, as Havensure has provided no authority indicating that the alleged hidden compensation was illegal under Ohio law. Havensure has cited to a complaint against ULR filed in New York state court by the New York Attorney General, as well as to an "Assurance of Discontinuance" that Prudential submitted to the New York Attorney General. Yet the New York Attorney General's efforts to enforce New York law have no bearing upon Ohio law. If Havensure believes that Ohio should prohibit Prudential's behavior, it remains free to urge the Ohio Attorney General or the Ohio legislature to take action against such behavior.

with Prudential's desire to keep York's business.  Uncontradicted evidence (Daniel Hettrich's e-mail) indicates that Prudential believed that it would lose York's account if Havensure became York's broker.  Consistent with this, Frank Corsi's e-mail stressed the profitability of the York account (stating that it ran a 42% loss ratio) before explaining that Prudential matched CIGNA's bid to prevent Havensure from winning the account.  In fact, Havensure itself concedes that "Prudential understood its options to be (a) potentially lose York's business, or (b) interfere with Havensure's business opportunity . . . ." Appellant's Brief at 24.  No rational jury could conclude that a desire to retain a profitable account was an improper motive.

Granted, evidence in the record also indicates that Prudential preferred to do business with ULR rather than Havensure, both because Havensure's business model did not produce mutual gain and because ULR "brought [Prudential] to the dance."  Yet neither Prudential's desire to avoid a broker who produced less profitable outcomes for Prudential nor Prudential's concern with preserving its existing business relationships constitute improper motives.  Rather, they were both valid business considerations. *See Hoyt, Inc. v. Gordon & Assocs., Inc.*, 662 N.E.2d 1088, 1095 (Ohio App. 1995) (finding that Consolidated Biscuit's refusal to buy fig paste from a manufacturer unless the manufacturer switched brokers was privileged because the preferred broker "was better able to meet the needs of  . . . Consolidated Biscuit," so "Consolidated Biscuit had a clear stake and economic interest in influencing [the manufacturer] to broker its fig paste through [the preferred broker].").

Given that all available evidence indicates that Prudential acted in a permissible fashion with proper business motives, no rational jury could conclude, on the basis of those factors, that Prudential's actions were not privileged.  Further, Havensure has not suggested that the remaining factors, on their own, render Prudential's interference improper.  Accordingly, Havensure has failed to show a genuine issue of material fact with respect to whether Prudential's interference was privileged, and the district court properly granted summary judgment in favor of Prudential on that basis.

**III**

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.