**BUCKINGHAM, DOOLITTLE & BURROUGHS, L.L.P., et al., Plaintiffs,**

v.

**BONASERA et al., Defendants.**

2010-Ohio-1677.]

Court of Common Pleas of Ohio,
Franklin County.

No. 09 CVH–01–553.

Decided March 8, 2010.

Tucker Ellis & West, L.L.P., Harry D. Cornett Jr., and Benjamin C. Sassé, for plaintiffs and counterclaim defendants.

James E. Arnold & Associates, L.P.A., James E. Arnold, James G. Vargo, and Scott J. Stitt, for defendants and counterclaimants.

FRYE, Judge.

## I. Introduction

{¶ 1} The model of a lawyer newly called to the bar joining a firm, gaining experience, advancing to partnership, and then enjoying tenure until retirement is—if it ever truly existed—observed less in recent years. In its place are frequent lateral moves by lawyers both within the private bar and in and out of government or business. While the movement of senior-level lawyers with a book of business attracts most attention, even newer lawyers move with frequency. Thus, within three years after law school, more than a third of lawyers responding to a 2004 American Bar Association survey had changed jobs at least once. By seven years in practice, 53 percent of newer lawyers had changed practice settings. Libby, Conflicts Check, Please (2010), 96 A.B.A. J. 24.

{¶ 2} Instability in the legal-services section of the United States economy probably explains some of this; reportedly, 6,800 jobs in 2008, and another 10,300 jobs in the first quarter of 2009, were lost in that segment of the economy. Freeman, Contractual & Ethical Issues of Transition: Lawyer Mobility in an Uncertain Market (2009), 23 Chicago B. Assn. Rec. 30. Today, even partners may confront law-firm agreements that include "a so-called guillotine termination clause that permits termination without cause and without notice," rather than the traditional paradigm of permanent tenure. Id.

{¶ 3} This suit arose when nearly every senior lawyer in the Columbus office of a well-established multicity law firm became disenchanted, collectively negotiated with several potential firms, and ultimately moved with all the associates and staff to a different multicity firm's Columbus office. Despite well-documented mobility within the legal profession, case law nationwide is relatively limited and usually addresses only movement by one or a few lawyers, not an entire branch office. Nevertheless, several pretrial motions now require this court to attempt to identify the operative rules.

{¶ 4} Cases like this one are not simple run-of-the-mill commercial disputes. They implicate overarching public values of client access and choice of lawyers that the law protects. Yet, law firms are businesses, not social clubs. Understandably, firms seek protection for financial investments in intangible things like training and marketing lawyers as well as against potential financial loss from

shoddy practice. Economic issues that must be confronted when an individual—particularly a rainmaker—departs are magnified when a group leaves behind an empty office. Setting aside the hole that departure might leave in a firm's practice, a group departure may trigger significant long-term lease obligations for those remaining behind (unless personal guarantees or other financial ties like salary holdbacks keep the departing lawyers in the picture, which is part of the story here). Viewed from the perspective of individual lawyers, on the other hand, few options may be perceived to exist. If compensation is deemed inadequate, working arrangements—like billable-hour targets—become too burdensome, or if firm management decides to invest in far-flung new office locations over the objection of those practicing closer to home, moving to a different practice setting may be the only logical choice.

{¶ 5} Essentially the only black-letter rule easily drawn from the case law is that there is an absence of hard lines defining lawyers' fiduciary duty to their partners and firm when these situations arise. E.g., *Graubard, Mollen, Dannett & Horowitz v. Moskovitz* (1995), 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179, 1183, quoted in *Wenzel v. Hopper & Galliher, P.C.* (Ind.Ct.App.2002), 779 N.E.2d 30, 38–39; *Dowd & Dowd, Ltd. v. Gleason* (1998), 181 Ill.2d 460, 476, 230 Ill.Dec. 229, 693 N.E.2d 358.

## II. The Factual Record

### A. The Parties

{¶ 6} Buckingham, Doolittle & Burroughs is a prominent law firm founded in Akron in 1913. The Columbus office was opened by two lawyers in 1989. By 2007, the firm had five offices (Akron, Boca Raton, Canton, Cleveland, and Columbus) and was among the largest 250 firms in the United States. Twenty-eight lawyers practiced in the Columbus office as of June 1, 2008.

{¶ 7} Organizationally, three related entities collectively composed the firm. Buckingham, Doolittle & Burroughs, L.L.P., is an Ohio-registered limited-liability partnership created pursuant to R.C. 1775.64 ("the partnership"). It had two corporate partners, namely Buckingham, Doolittle & Burroughs, a Legal Professional Association ("BDB Ohio"), and Buckingham, Doolittle & Burroughs, a Florida Legal Professional Association ("BDB Florida"). Suit was brought by the partnership and BDB Ohio (collectively, "Buckingham").

{¶ 8} Defendants are former employees and shareholders of BDB Ohio, all of whom practiced in Buckingham's Columbus office.[1] They, in turn, joined as

---

1. Buckingham's action is against former employees of the partnership and shareholders of BDB Ohio in their Columbus office: Thomas J. Bonasera, Donald B. Leach Jr., Thomas W.

third-party defendants (realigned in a previous order as plaintiffs) the individual lawyers who managed Buckingham at the time of events now in suit.[2] These individuals constituted the board of managers of the top-tier L.L.P. (the partnership) drawn from the firm's various offices. Unlike the situation in law firms organized as partnerships, in which the K–1 tax form records compensation, Buckingham recorded income on W–2 forms. Although Buckingham's senior lawyers were shareholders, the firm also called them equity partners, while other lawyers with essentially a salary arrangement were casually called income partners (reflecting titles technically belonging only to partnerships). The informality of titles is irrelevant to this decision on motions, and titles are sometimes used interchangeably.

### B. Plaintiffs' Claims

{¶ 9} The amended complaint (filed September 18, 2008) has been reduced in scope through amendment and prior rulings by this court. At present, it sets out causes of action against lawyers in the group that departed for breach of fiduciary duty and duty of loyalty (Count 1), civil conspiracy (Count 2), unfair competition (Count 4), and tortious interference with business relations and prospective contract relations (Count 5). At oral argument on February 26, 2010, counsel for Buckingham conceded that the unfair-competition claim essentially duplicates the claims for breach of fiduciary duty and tortious interference. Accordingly, that claim will be eliminated from the case for trial.

{¶ 10} From the law firm's perspective, the economic focus of much of this case is the 15–year lease for office space in the Arena District of Columbus that Buckingham undertook in 2001. The building in which Buckingham became a tenant was highly desirable, being among the first developed on the grounds of the old Ohio Penitentiary. Allegedly prompted by the lateral addition of new lawyers, including defendant Thomas Bonasera, a former president of both the Columbus and Ohio State bar associations, Buckingham's Columbus office expanded in early 2006. At the same time, the lease term was extended by five years until September 2021. In this and other ways, Buckingham claims, it invested "considerable time, energy and resources over the years to establish and expand * * * in the central Ohio market."

---

Hess, Donald A. Antrim, Peter W. Hahn, Jan E. Hensel, Richard A. Hernandez, Andrew W. Owen, Eric J. Plinke, Charles E. Ticknor III, Michael L. Williams, and Brett L. Miller. Tom Sigmund left as well but did not go with the group.

2. The board of managers is alleged to consist of Patrick J. Keating, Steven A. Dimengo, John P. Slagter, Susan C. Rodgers, Stephen M. Hammersmith, Mark J. Skakun III, Robert E. Pershes, Nicholas T. George, and Timothy J. McEldowney.

{¶ 11} Fortunately, the firm to which the Columbus lawyers moved on July 1, 2008, already had a Columbus office with a shorter, less costly lease obligation. So, a sensible arrangement was made under which the departing lawyers stayed in Buckingham's old space and changed the name over the door to Dinsmore & Shohl. Buckingham then assumed the lease for Dinsmore & Shohl's space in another downtown building. When that office space remained completely vacant after some effort to sublease it, Buckingham paid a lump sum to buy out the lease from the landlord and stop the bleeding. The parties' practical choices minimized but did not eliminate the lease obligation that Buckingham seeks to recoup through this lawsuit.

## C. Defendants' Counterclaims

{¶ 12} Defendants' counterclaims seek relief against the former firm, and its individual managers seek relief for withholding money allegedly due the departing partners. When the shareholders departed effective June 30, 2008, they were not paid a salary for June. In addition, firm capital accounts invested in Buckingham have never been repaid. Beyond that are so-called holdback payments, still held at Buckingham, of roughly 20 percent of each individual's 2008 salary. As an informal means of financing firm operations, full salary accrued but was not paid out each month between January and June until firm income for a year better materialized. Buckingham contends that the firm should keep all the money because the departing lawyers were "faithless servants."

## D. Firm Management

{¶ 13} Buckingham imposed no restrictions on the shareholders' or income partners' ability to leave the firm. There were no personal guarantees demanded of individuals in connection with the Columbus office space.

{¶ 14} In summarizing the story, it seems important to note something that may already be obvious to those familiar with large modern law firms. This was no handshake business arrangement. Buckingham adopted a sophisticated shareholders' agreement to address firm management and profitability. It created an internal procedure to evaluate each lawyer's contributions and fix compensation. The agreement candidly acknowledged that it was imperfect but memorialized that the firm's goal was a compensation system that "encourages those activities that are crucial to our survival, growth, and our future, and discourages activities that are self-serving and destructive." The system was deemed "as fair as possible" to all shareholders but one that "avoid[ed] major swings in compensation from year to year."

*E. Buckingham's Closed Compensation System*

{¶ 15} Consistent with the structured management and compensation system agreed upon, all shareholders recognized a "tradition of a closed compensation system" so that after August 2004, they would "share more summary compensation data than in the past, but the closed nature of the system w[ould] remain intact." It was apparently universally understood that firm leadership did not wish individual attorney compensation published, fearing that it might cause competition among attorneys and occasional backbiting. A list of compensation criteria was created, but the shareholders agreed among themselves that the list was a guideline and that the board of managers enjoyed "final discretion over matters of compensation." Subjective matters such as "loyalty and dedication to * * * firm objectives" were mentioned repeatedly and were to "be viewed favorably" in setting compensation. Conversely, "[m]anagement ha[d] the authority to change any credit [for client origination] when negative behavior is known," and "[i]f a lawyer refuses to accept * * * [work] assignments, his or her compensation will be reduced accordingly. Team players will be recognized when setting compensation." This closed compensation system may have trade-secret implications with jurors at trial.

*F. Storm Clouds in Early 2008*

{¶ 16} Buckingham shareholders' resignations were given on June 5, effective June 30, 2008. On July 1, all shareholders except one (who also left but landed in another firm) became partners in Dinsmore & Shohl's Columbus office. Events over a number of months led to that climax.

{¶ 17} The story seems to begin with a special shareholders' meeting that Buckingham held in January 2008 to discuss the future direction of the firm. It was not a casual or impromptu get-together. Columbus lawyers Peter Hahn and Brett Miller served on a firmwide shareholders committee to plan the event. Those firm planners received firm financial statements not otherwise shared.

{¶ 18} Columbus shareholders Hahn, Leach, Hess, Bonasera, Ticknor, Owen, Miller, and possibly Hernandez all ate lunch together after that special meeting at a nearby T.G.I. Friday's restaurant. "We were all very frustrated" and "[had] virtually no certainty about the future of that firm," Hahn recalls. No specific plan was hatched, but feelings about the firm were shared and there definitely was a sense that they should look at other options.

{¶ 19} Over the succeeding weeks, the Columbus lawyers casually discussed among themselves what other firms might be of an appropriate size and share a common philosophy about law-firm management. Thereafter, further conversations involving some Columbus shareholders were held. In some instances, conversations occurred with headhunters and with representatives of other firms.

Initially, Leach, Ticknor, and Hahn had discussions. Hahn had "the feeling * * * this office [was] fracturing."

{¶ 20} According to Hahn, the Buckingham firm was in a state of crisis. An unprecedented change of leadership was ongoing, and special committees were formed to make significant decisions that ordinarily had been the responsibility of the board of managers. Hahn perceived, however, that the board had been "essentially emasculated." "No one knew who the next president was going to be." There was an "air of panic among the partners, not just in Columbus."

{¶ 21} Leach told Hahn a few weeks after the firm's strategic-planning meeting that he had had conversations with most or all of the Columbus shareholders and income partners and that they shared a general inclination to stay together in the practice of law so that the Columbus office did not "fracture." According to Hahn, leaving as a group simply resulted from multiple, informal discussions in which individual lawyers expressed a desire to continue to practice together and not break up the group. They likewise considered, early in the process, taking associates and staff to another firm in order to better serve clients and, allegedly, because they recognized that Buckingham was unlikely to need them if all the more senior lawyers departed.

{¶ 22} Columbus attorney Thomas W. Hess was a shareholder on Buckingham's firmwide board of managers until March 5, 2008, and served as the Columbus office managing partner. Accordingly, lawyers discussing possible departure did not initially include Hess. Hess's interrogatory answers confirm that he had conversations with Buckingham's Columbus shareholders and partners beginning March 5, 2008, and collectively with five other law firms. Buckingham argues, however, that the evidence construed most strongly in its favor might convince a reasonable juror that Hess was aware of discussions sometime earlier. Under the standard applicable to summary-judgment motions, the court cannot ignore this inference. After all, Eric Plinke, Don Antrim, Peter Hahn, and Don Leach of Buckingham's Columbus office all participated in internal discussions leading to well-planned meetings with other law firms. Human nature might lead a juror to conclude that they could not have completely ignored Hess, another prominent lawyer and leader of the office. This may, in short, have fiduciary-duty ramifications at trial.

{¶ 23} The earliest meeting with another law firm occurred in mid February 2008 with Ulmer & Berne. However, there appears to be no evidence that any of the departing lawyers advised Buckingham of these discussions before mass resignations were delivered on June 5, 2008. That failure is claimed to have deprived Buckingham of its opportunity to try to talk some (or all) of the dissatisfied Columbus lawyers back into the fold, or quickly go recruit replacement lawyers who might have allowed the Columbus office to survive, or make

sensible efforts to retain associates and staff. So, when the bomb went off on June 5, according to Buckingham, it had essentially no option to maintain its office.

{¶ 24} Not to be overlooked is the fact that evidence (and reasonable inferences) suggests that the 12 departing Columbus lawyers actually were conscious of minimizing hardship on Buckingham, most specifically by addressing the significant expense of the Columbus office lease. Taking along associate lawyers and support staff might also be seen as intended to minimize hardship for Buckingham, or it even may have proven beneficial to the larger firm. Though such at-will employees could easily have been eliminated from Buckingham's payroll after the shareholders departed, it potentially would have had a very negative public relations impact upon Buckingham. Again, the story on this point is too complex to resolve under Civ.R. 56.

### G. The Departing Lawyers Use of Buckingham's Trade Secrets

{¶ 25} As mentioned earlier, significant steps were taken to maintain Buckingham's closed compensation system, including confidentiality of financial records, income- and business-production numbers, and similar data. This closed system contrasts with the more open system used in some businesses and law firms. Against this backdrop, a jury might find it significant that beginning in February 2008 some internal financial information (such as work production for Buckingham shareholders and income partners and perhaps also associates) was shared with Ulmer & Berne and other firms. Ulmer & Berne was told, at the least, that Buckingham associates were significantly underpaid vis á vis Ulmer lawyers. The goal in such disclosures is said to have been to ensure that Buckingham associates and staff salaries would be adjusted for employees who made a move, so they did not inadvertently end up with pay cuts at a new firm. However, among the obvious dangers that may attend the sharing of such internal information with other law firms is that cherry-picking could occur if merger discussions fell through. It is not clear if client names were discussed with Ulmer & Berne for conflict checks or other purposes. So, as to these points, there are genuine disputes of material fact under the trade-secret and fiduciary-duty claims.

{¶ 26} The record also reflects that many Columbus partners were members of firmwide committees or practice group chairs within Buckingham. These and other informally designated management positions may also have resulted in confidences being reposed in shareholders that, inferentially, ended up being used against the Buckingham firm in merger discussions.

{¶ 27} One response by the defendants is that Buckingham regularly recruited lawyers to join the firm laterally from other law practices. When those situations

occurred, Buckingham itself gathered data and made an effort to gauge the comparable incomes, hourly rates, collections, client list, and similar data on lateral hires seeking to join Buckingham. While probably admissible, this does not insulate the defendants. Common practice for individual lawyers seeking lateral opportunities is understood to include disclosure of one's own clients, experience, salary, and benefits; that is a far cry from making such disclosures for an entire integrated group, or so a jury could reasonably conclude.

### III. Individual Managers' Motion for Judgment on the Pleadings on Defendants' Counterclaim

{¶ 28} The Columbus lawyers sued in this case brought counterclaims against the individuals who composed Buckingham's board of managers. (Those individual lawyer/managers were realigned as plaintiffs side by side with the Buckingham firm earlier in this suit).

{¶ 29} On January 8, 2010, nine lawyer/managers at Buckingham sought judgment on the pleadings on those counterclaims. As they see it, the issue, quite simply, is whether the former lawyers in Columbus may seek damages for an alleged breach of fiduciary duty by the officers or board of managers, who, technically speaking, managed only the parent, Buckingham, Doolittle & Burroughs, L.L.P., and not the operating law firm, BDB Ohio. It is argued that no legal duty exists because firm management at the partnership level owed no fiduciary duty to those "merely employees" of the separate and subordinate partner/corporate BDB Ohio entity. Practically speaking, as the court understands it, this all turns on the claim that Buckingham owes the June 2008 salary and related holdbacks.

{¶ 30} A Civ.R. 12(C) motion for judgment on the pleadings is intended to resolve pure questions of law. The court may consider only the pleadings and any writings incorporated in them. *Vinicky v. Pristas*, 163 Ohio App.3d 508, 2005-Ohio-5196, 839 N.E.2d 88, ¶ 3, and cases cited.

{¶ 31} The firm's managers initially argue that nothing in the partnership agreement "purports to create a fiduciary duty running from the * * * Board members and/or officers of that [partnership] entity to individual shareholders of one of the corporate partners." However, a fiduciary duty may be owed without any explicit contractual undertaking. Ohio law examines instead whether "special circumstances exist" and whether there has been *"special* repose or trust" placed in one of the parties in determining whether there is a fiduciary relationship. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, at paragraph one of the syllabus and ¶ 26. "A fiduciary relationship may be created out of an informal relationship but this is done only when both parties understand that a special trust or confidence has been reposed." *Umbaugh Pole Bldg. Co. v.*

*Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320, paragraph one of the syllabus. It requires no citation of authority to observe that a fiduciary duty may exist in a setting where individual lawyers repose trust—if not always confidence—in their law-firm-management group that sets compensation and other conditions of employment.

{¶ 32} Next it is argued the individual managers "are unaware of any authority that would extend the commonly-recognized fiduciary duty owed by partners to non-partner managers and/or officers of a partnership." This is merely another turn on the first argument. Notwithstanding the multiplicity of business forms through which Buckingham operated, fiduciary duties are commonly recognized in each of them. "It is well recognized that directors of a corporation occupy a fiduciary relationship to the corporation *and its shareholders* and are held strictly accountable and even liable if corporate property or funds are wasted or mismanaged due to their inattention to the duties of their trust. * * * Under Ohio law, directors may not, in breach of their fiduciary duties, act unfairly to the disadvantage of their corporation *or its shareholders*." (Emphasis added.) *Stepak v. Schey* (1990), 51 Ohio St.3d 8, 14, 553 N.E.2d 1072 (Holmes, J., concurring). Similarly, partners owe a fiduciary duty to one another. *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 306, 631 N.E.2d 1040. While the court understands that the partnership consisted of two corporate partners and no individual partners, the legal determination whether a fiduciary duty exists is fact-specific, and here there is a dispute of fact. That precludes ruling as a matter of law on this argument as well.

{¶ 33} Third, the managers argue that a fiduciary duty can run only to the overall business entity and not to individual employees of the entity. Defendants rely upon an unpublished Sixth Circuit decision authored by Judge Sutton. *Gresh v. Waste Servs. of Am., Inc.* (C.A.6, 2009), 311 Fed.Appx. 766, 771, citing *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.* (C.A.2, 1995), 56 F.3d 427, 432. However, the blanket statement that "[c]orporate officers generally do not owe fiduciary duties to at-will employees" attributed to these cases (decided, respectively, under Kentucky and New York law) ignores the factual background for the claim pleaded here. The Columbus shareholders were not run-of-the-mill at-will employees. As shareholders they were part owners. As noted earlier, the concurring opinion in the *Stepak* decision certainly recognized that fiduciary duty runs to shareholders. Moreover, law-firm management at Buckingham was operating a business and given special status to do so—perhaps accompanied by enhanced compensation. It seems unlikely that the responsibilities of management were intended to be circumscribed by no reciprocal fiduciary obligations to shareholder-lawyers.

{¶ 34} The most analogous situation to that presented here may be a closely held corporation. Ordinarily in that setting even at-will employee-shareholders have significant rights. E.g., *Gigax v. Repka* (1992), 83 Ohio App.3d 615, 621, 615 N.E.2d 644. The Franklin County Court of Appeals summarized the law in *Steele v. Mara Ents., Inc.*, Franklin App. No. 09AP–102, 2009-Ohio-5716, 2009 WL 3494847, ¶ 20–21:

{¶ 35} "Although the at-will nature of Ohio's employment law gives employers the right to discharge employees for any reason or no reason at all, a public policy-based exception to the employment at-will doctrine arises 'when an employee is discharged or disciplined for a reason which is prohibited by statute.' *Greeley v. Miami Valley Maint. Contrs., Inc.* (1990), 49 Ohio St.3d 228 [551 N.E.2d 981], paragraph one of the syllabus; *Painter v. Graley* (1994), 70 Ohio St.3d 377 [639 N.E.2d 51], paragraphs two and three of the syllabus. Public policy exceptions to the employment at-will doctrine are not limited to statutory provisions but are ascertainable from any number of other sources. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 150, 1997-Ohio-219 [677 N.E.2d 308].

{¶ 36} "Ohio recognizes as public policy a heightened fiduciary duty between majority and minority shareholders when the plaintiff was a shareholder, director, and employee of a closely held corporation. *Morrison v. Gugle* (2001), 142 Ohio App.3d 244, 254–55 [755 N.E.2d 404], citing *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108 [548 N.E.2d 217]. Plaintiff accurately points out that '[a] majority shareholder has a fiduciary duty not to misuse his power by promoting personal interests at the expense of corporate interests.' *United States v. Byrum* (1972), 408 U.S. 125, 137, 92 S.Ct. 2382, 239 [33 L.Ed.2d 238]. 'Majority or controlling shareholders breach such a fiduciary duty to minority shareholders when control of a close corporation is utilized to prevent the minority from having an equal opportunity in the corporation.' *Crosby* at 109 [548 N.E.2d 217]. Absent a legitimate business purpose, such a breach is actionable. *Morrison* at 255 [755 N.E.2d 404]."

{¶ 37} Finally, the individual managers argue that they are protected by R.C. 1775.05(A), a provision formerly found in the Ohio Uniform Partnership Act.[3] It recognized, they argue, that a partnership is a distinct legal entity such that any duties owed to it are not extended or owed to partners. The Ohio State Bar Association Corporation Law Committee Comment (prepared in 2006) that accompanied the statute conveys a more limited intent. It points out that

---

3. "A partnership is an entity of two or more persons to carry on as co-owners a business for profit and includes such an entity that has limited liability as provided in this chapter * * *." R.C. Chapter 1775 was repealed effective January 1, 2010. It was replaced by R.C. Chapter 1776, in which R.C. 1776.21(A) now states that "[a] partnership is an entity distinct from its partners."

historically there was a theoretical split between jurisdictions over whether a partnership was an aggregation of its individual partners (the "aggregate theory") and or a discrete entity "separate and apart from its partners" (the "entity theory"). So, while the Buckingham partnership is properly viewed as a distinct entity under this statute (as well as under R.C. 1776.21(A), which replaced it effective January 1, 2010), that does not also mean that individual members of the board of managers owed duties only to the partnership entity and could ignore the corporate partners and their shareholders in this interlocking business arrangement. As explained above, fiduciary-duty law is not so rigid.

{¶ 38} The court acknowledges that the committee's comment to the new statute states that it "mandate[s] a different result under Ohio partnership law than the results previously encountered in cases such as *Arpadi v. First MSP Corp.* (1994), 68 Ohio St.3d 453, 628 N.E.2d 1335." *Arpadi* held that "[a] partnership is an aggregate of individuals and does not constitute a separate legal entity. (R.C. 1775.05[A], construed * * *)." Id. at paragraph one of the syllabus. While the balance of *Arpadi* discussed to whom a fiduciary duty is owed by an attorney for a limited partnership, the discussion of fiduciary duty in an attorney-client relationship offers no guidance here. Buckingham's board of managers is sued for acts managing a business, not for decisions primarily made as lawyers.

{¶ 39} This court cannot say as a matter of law that the members of the Partnership's board of managers owed no fiduciary duty to individual lawyer/shareholders in the subordinate operating businesses controlled by that partnership. The motion for judgment on the pleadings is therefore denied.

## IV. Defendants' Motion for Summary Judgment

### A. What's Permitted for One Is Permitted for All?

{¶ 40} On December 15, 2009, defendants sought summary judgment on all claims by Buckingham. The firm responded with a Civ.R. 56(F) motion, pointing out that not all discovery had been completed. The court examines the issues, having clearly in mind that the record is incomplete and that all reasonable inferences of fact must be drawn favorably to plaintiffs under Civ.R. 56.

{¶ 41} The parties seek the court's view on one legal question that is clarified— but not settled one way or the other—by the incomplete record. The Columbus lawyers strongly argue that "if one [Columbus] attorney has the unfettered right to leave a law firm at any time, [then] each and every attorney in the firm has the same right, barring some agreement to the contrary. As such, the * * * decision to leave as a group, standing alone, cannot provide the basis for liability." Defendants also advance the novel argument that an individual lawyer's hourly

rate, total billable hours, and other business-production data do not qualify as trade secrets under Ohio law. "[A]n attorney seeking to explore the possibility of joining a new law firm must have some right to convey information related to his or her practice, as a complete ban would infringe on Ohio Rule of Professional Conduct 5.6."

{¶ 42} The proposition that a group can take collective action that any individual might do alone is attractive in its simplicity, but the law is more nuanced. A mass exodus usually is not accomplished in the same way, or with the same economic impact, as the resignation of one or two lawyers. An often-cited decision of the California Supreme Court addressed a breach-of-fiduciary-duty claim when a large part of one law-book publishing house jumped to open a West Coast office for a significant competitor. The president jumped too, becoming an executive of the other publisher. The California court unanimously rejected the same pithy argument made here. "Defendants argue that the salary information is not confidential because the employees could have revealed their own salaries to Bender Co. or anyone else. It requires little talent to distinguish between a situation in which an individual voluntarily discloses his own salary to another and one in which the unpublished salary list of a group of prospective employees is revealed to a competitor for the purpose of facilitating the recruitment of the corporation's personnel." *Bancroft–Whitney Co. v. Glen* (1966), 64 Cal.2d 327, 352, 49 Cal.Rptr. 825, 411 P.2d 921.

{¶ 43} The law of agency recognizes that even before the termination of a relationship, an agent is entitled to make arrangements to leave and compete. However, the agent cannot properly use confidential information about his existing employer's business, cannot solicit customers for the rival business before the end of employment, and cannot do similar acts in direct competition while remaining at the old employer. Restatement of the Law 2d, Agency (1958), Section 393, Comment *e.* The same authority further remarks that "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." Given the factual record here, the court cannot grant summary judgment because there is a genuine dispute of fact whether the departing Columbus shareholders misused inside information in negotiating and ultimately leaving Buckingham; one relevant fact is that they did not leave separately but instead left—apparently—in concert.

{¶ 44} Defendants argue that under *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 707 N.E.2d 853, an attorney is not precluded from identifying clients to a potential employer but merely is blocked from using trade secrets to compete after departing. This oversimplifies the holding. And the difficulty here is not some claimed misuse of the identity of clients, or their

names and addresses as in *Siegel.* Here, the information allegedly misused was internal business, personnel, and financial data. It was the collection of all the data that permitted negotiating an economic structure under which Columbus shareholders maintained not merely their individual value as lawyers, but a collective value as a working group in the marketplace. Recognizing the lengths to which Buckingham went to restrict access to such trade-secret information internally, and that significant amounts of data were shared with direct competitors in the Columbus marketplace where Buckingham had made a long-term, sizeable investment, the court cannot say that a reasonable jury would never conclude that the alleged misuse of information breached the fiduciary duty owed to the Buckingham firm.

{¶ 45} The general rule of fiduciary duty in this law-firm context is easy to state but challenging to apply because there is a spectrum of conduct that may occur when a lawyer separates from an existing practice. The New York Court of Appeals has observed that at one end of the spectrum, there is a single attorney dissatisfied with his or her existing association, who merely takes steps to locate alternative space and, ideally after notice to the former firm, give clients notice of plans to leave. At the other end of the spectrum, there are secret attempts to lure firm clients to a new association, perhaps coupled with lying to clients about their rights with respect to choice of counsel, lying to partners about plans to leave, abandoning the old firm on short notice, taking files surreptitiously, or taking other acts plainly inconsistent with a fiduciary duty. *Graubard Mollen Dannett & Horowitz*, 86 N.Y.2d at 120, 629 N.Y.S.2d 1009, 653 N.E.2d 1179. The law can scarcely disregard questionable conduct just because it is done by an entire branch office.

### B. Arrangements with Associates and Staff

{¶ 46} Defendants also argue that their solicitation of lawyers and staff to leave for Dinsmore & Shohl is a nonissue. They claim that they did not approach associates and staff until June 5, after notice to Buckingham. They argue that Buckingham did nothing, having recognized that the remnants of the Buckingham firm could never sustain a Columbus office (without the clients and income generated by the departing lawyers), so Buckingham has no damages.

{¶ 47} Leaving aside the fact that the record does not clearly foreclose Buckingham's position on this issue as required by Civ.R. 56(C), the law does not readily favor such a factual argument. For instance, the Restatement cautions that "[t]he limits of proper conduct with reference to securing the services of fellow employees are not well marked." Restatement, Section 393, comment e. On similar facts, when a large number of salesmen left a business to follow a manager out the door, it has been held that "the requisite causality" was proven

notwithstanding the existence of high employee turnover and employee dissatisfaction. Those factors were seen to go toward determining the extent of the employer's damages rather than eliminating all liability. *Am. Republic Ins. Co. v. Union Fid. Life Ins. Co.* (C.A.9, 1972), 470 F.2d 820, 826. Moreover, to the extent that the Columbus lawyers offer only a factual argument that Buckingham was not harmed, it has been observed that "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon* (C.A.2, 1994), 13 F.3d 537, 543. How the law comes out on this causation issue probably turns on how the factual record comes in at trial.

{¶ 48} Defendants point to a terse statement of law in a Second District Court of Appeals opinion recognizing that the " '[p]ersuasion of employees to leave their employment, which under the terms of their contract is terminable at will, if unaccompanied by intimidation or any other form of coercion, is not unlawful.' " *Miller Bros. Excavating, Inc. v. Stone Excavating, Inc.* (Jan. 16, 1998), 2nd Dist. No. 97–CA–69, 1998 WL 12646, at *9, quoting *Emery Ents., Inc. v. Std. Plumbing & Heating Co.* (Dec. 30, 1988), Richland App. No. 2615, 1988 WL 142865, at *8. Defendants make too much of the point. More recent authority in the law-firm context rejects a categorical view that an employer may never maintain a cause of action for intentional interference with at-will employees. In one case, the chair of a firm's litigation department, with another partner responsible for over 500 client matters, abruptly resigned without notice. The attorneys left behind no status reports or lists of pending cases or deadlines, and for good measure deleted and destroyed the law firm's computer files containing client documents and forms. They also improperly solicited clients and "cultivated employee discontent." *Reeves v. Hanlon* (2004), 33 Cal.4th 1140, 1154–1155, 17 Cal.Rptr.3d 289, 95 P.3d 513. The California Supreme Court acknowledged the case law that "shields those employers who hire a competitor's at-will employees without engaging in unlawful conduct" but found it inapposite on such facts. Again, until the record shows much more clearly the nature of the departing shareholders' communications to Buckingham's Columbus associates and staff, and the extent to which Dinsmore & Shohl was able to match or improve upon salaries and other benefits for those employees through use of Buckingham's trade-secret information, summary judgment is not possible.

{¶ 49} Courts across the country use varied rules to evaluate whether asking colleagues to join a withdrawing lawyer is consistent with the fiduciary duty owed a law firm. According to the author of a 2009 article in the Chicago Bar Record, supra (which includes case citations), in New York State[4] "you can solicit your

---

4. More specifically, prewithdrawal recruitment of firm employees is generally allowed only after notice of the intention to withdraw. With that caveat, New York courts have "fully

partners but not your employees," while in Maryland "you can solicit the people in your 'circle of friends.'" Virginia is said to allow solicitation "out of the office and after hours" while Massachusetts "provides that you can solicit the people with whom you are actively working." The difficulty in determining when actions by departing lawyers "impermissibly solicited co-workers, [requires] the trier of fact [to] 'consider the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the extent of any benefits promised or inducements made to co-workers to obtain their services for the competing * * * enterprise.' * * * 'No single factor is dispositive * * *.'" *Sec. Title Agency, Inc. v. Pope* (App.2008), 219 Ariz. 480, 493, 200 P.3d 977, quoting *Jet Courier Serv., Inc. v. Mulei* (Colo.1989), 771 P.2d 486, 497. Since the law offers nearly innumerable possible rules, Buckingham and the Columbus lawyers deserve a trial, so that Ohio appellate courts can later develop the law here against a full factual record.

### C. Use of Associate and Staff Salary Data

{¶ 50} A closely related question is whether there was misuse of trade secrets (consisting of associate salary, performance, and client-familiarity) concerning association lawyers. The practical question is whether contacts with other law firms about associates and staff constituted de facto competition with Buckingham. Consider, for instance, that if financial data on Buckingham associates in Columbus was shared with Dinsmore & Shohl, it may have started a stampede of sorts, under which Buckingham never had any genuine opportunity to retain those lawyers or staff. Providing a directly competitive law firm with information on associate lawyers at the old firm has been recognized "to give it an unfair advantage in recruiting certain employees." *Gibbs v. Breed, Abbott & Morgan,* 271 A.D.2d at 187, 710 N.Y.S.2d 578, citing *Bancroft–Whitney v. Glen.*

{¶ 51} To the extent that defendants' arguments implicate the specific claim of tortious interference with a business relationship between Buckingham and its Columbus associates and staff, seven factors must be examined to see whether the conduct is proper—legally privileged—under Ohio law. Essentially, defendants seem to argue that their conduct was "privileged," "justified," or "proper" because it arose out of good motives and advanced social interests. To be sure, those factors are among the seven-part Restatement test followed to determine privilege in Ohio. The court also recognizes that Ohio law places the burden on Buckingham to show that defendant's conduct was *not* privileged or commercially

---

embraced the principle that 'partners may not be restrained from inviting qualified personnel to change firms with them'" *Nixon Peabody L.L.P. v. de Senilhes* (Sup.Ct.2008), 20 Misc.3d 1145A, 873 N.Y.S.2d 235, citing *Gibbs v. Breed, Abbott & Morgan* (2000), 271 A.D.2d 180, 187, 710 N.Y.S.2d 578, and other cases.

proper. *Havensure, L.L.C. v. Prudential Ins. Co. of Am.* (C.A.6, 2010), 595 F.3d 312, 316, citing *Doyle v. Fairfield Mach. Co.* (1997), 120 Ohio App.3d 192, 697 N.E.2d 667, and other decisions; *Wagner–Smith Co. v. Ruscilli Constr. Co.* (C.P.), 139 Ohio Misc.2d 101, 2006-Ohio-5463, 861 N.E.2d 612, ¶ 14–17. The mere fact that the law recognizes a seven-factor test highlights the essential role that case-specific facts play in resolving the case.

### D. The Faithless–Servant Doctrine

{¶ 52} Defendants argue that Buckingham overstepped in asserting that it can self-help by not paying them for work performed in June 2008 and not releasing their holdback salary or other funds premised upon the notion those departing shareholders were "faithless servants." While acknowledging that the doctrine is recognized in Ohio, they argue that it requires far more egregious misconduct than has occurred here.

{¶ 53} In a nutshell, "[t]he faithless servant doctrine states that an agent is entitled to no compensation for conduct which is disobedient or a breach of his duty of loyalty. *Fin. Dimensions, Inc. v. Zifer* (Dec. 10, 1999), Hamilton App. No. C–980960 [1999 WL 1127292]." *Columbus Homes Ltd. v. S.A.R. Constr. Co.,* 10th Dist. Nos. 06AP–759 and 06AP–760, 2007-Ohio-1702, 2007 WL 1083254, ¶ 52. Another recent decision summarized the doctrine more fully:

{¶ 54} "In Ohio, courts have adopted the 'faithless servant doctrine' enunciated by the Kansas Supreme Court, which provides the following:

[D]ishonesty and disloyalty on the part of an employee which permeates his service to his employer will deprive him of his *entire agreed compensation,* due to the failure of such an employee to give the stipulated consideration for the agreed compensation. Further, as public policy mandates, an employee cannot be compensated for his own deceit or wrongdoing. However, an employee's compensation will be denied only during his period of faithlessness.

*Roberto [v. Brown Cty. Gen. Hosp.* (1989), 59 Ohio App.3d 84, 85, 571 N.E.2d 467] (citing *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210 (1974)) (Emphasis in original). In *Roberto,* the court held that, under the faithless servant doctrine, an employer was entitled to withhold three years of deferred compensation from a hospital administrator who had embezzled from the hospital. Id. Other courts have similarly interpreted the faithless servant doctrine. *See, e.g., Goal Systems Int'l, Inc. v. Klouda,* No. 84AP–168, 1985 WL 10461 (Ohio Ct.App. 10th Dist. Oct. 10, 1985) (affirming an award for an employer for a portion of a disloyal employee's salary when, following his termination from employment, the former employee, a program developer, tried to market his computer program through a competitor); *Hey v. Cummer,* 89 Ohio App. 104, 97 N.E.2d 702 (1950) (affirming an award for an employer of an employee's entire compensation when the

employee profited secretly at the expense of employer); *Aramony* [*v. United Way of Am.* (S.D.N.Y.1998), 28 F.Supp.2d 147, 176, affirmed in part and reversed in part on other grounds, *Aramony v. [United Way] Replacement Benefit Plan* (C.A.2, 1999), 191 F.3d 140] (interpreting New York state law, ruling that a disloyal employee forfeits his right to compensation for services performed during a period of disloyalty, even if the employee's services have been, on balance, beneficial to the employer)." *Foley v. Am. Elec. Power* (S.D.Ohio 2006), 425 F.Supp.2d 863, 873.

{¶ 55} *Am. Elec. Power* also recognized that there is "no requirement that an agent actually receive a benefit before the faithless servant doctrine authorizes a forfeiture of the agent's compensation." Id. at 874.

{¶ 56} In this context of a departing lawyer, Illinois has applied the rule that "permits a.complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation." *Dowd & Dowd Ltd. v. Gleeson* (App.2004), 352 Ill.App.3d, 365, 385, 287 Ill.Dec. 787, 816 N.E.2d 754. Indiana and New York have applied similar rules in departing-lawyer cases as well. *Wenzel v. Hopper & Galliher, P.C.* (Ind.App. 2005), 830 N.E.2d 996; *Manning v. Rubin, Fiorella & Friedman, L.L.P.* (Sup.Ct. 2005), 9 Misc.3d 128A, 808 N.Y.S.2d 918. Apparently Ohio has never squarely confronted a claim for forfeiture of a lawyer's salary in this specific context. However, more generally it is clear in Ohio that a lawyer is not entitled to retain a legal fee otherwise due for work that included theft or some other clear and serious violation of a duty owed to a client. *State v. Silverman*, 10th Dist. Nos. 05AP–837, 05AP–838, and 05AP–839, 2006-Ohio-3826, 2006 WL 2075642, ¶ 159.

{¶ 57} Of course, law firms cannot simply be punitive because a lawyer departs. Clauses in law-firm agreements requiring outright forfeiture of a partner's equity interest in the firm upon withdrawal ordinarily are invalid as contrary to public policy. *Hackett v. Milbank, Tweed, Hadley & McCloy* (1995), 86 N.Y.2d 146, 155–157, 630 N.Y.S.2d 274, 654 N.E.2d 95 (and New Jersey and Iowa cases cited at fn. 4). So, keeping faith with one's law firm does not require blind allegiance. As the court understands the record presently, however, a finding that some or all of the departing Columbus shareholders were "faithless servants" between mid January and June 30, 2008, may be possible and would not violate public policy protecting lawyers' mobility. Fact-specific issues simply remain for trial.

## V. Conclusion

{¶ 58} Buckingham's motion for judgment on the pleadings and the defendants' motion for summary judgment are denied. Trial remains scheduled for May 24, 2010.

So ordered.