[Cite as *Omega Riggers & Erectors, Inc. v. Koverman*, 2016-Ohio-2961.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| OMEGA RIGGERS AND ERECTORS, INC., et al. | : | |
| | : | Appellate Case No. 26590 |
| | : | |
| Plaintiffs-Appellants | : | Trial Court Case No. 2010-CV-10021 |
| | : | |
| v. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| JOHN R. KOVERMAN, et al. | : | |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of May, 2016.

. . . . . . . . . . .

JAMES M. HILL, Atty. Reg. No. 0030633, 2365 Lakeview Drive, Suite A, Beavercreek, Ohio 45431-3639
        Attorney for Plaintiffs-Appellants

NEIL F. FREUND, Atty. Reg. No. 0012183, LINDSAY M. JOHNSON, Atty. Reg. No. 0077753, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
        Attorneys for Defendants-Appellees

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Plaintiffs-appellants, Michael Cotter and Al Anthony, shareholders of Omega

Riggers & Erectors, Inc. and Hevi-Duty, Inc., appeal from a summary judgment rendered

against them on their individual claims for legal malpractice against the corporate attorney. The plaintiffs contend that genuine issues of material fact preclude summary judgment, and request a remand for a trial on the merits. Defendants-appellees John Koverman and Koverman & Smith (hereinafter collectively referred to as Koverman) assert that the trial court properly rendered summary judgment.

{¶ 2} The plaintiffs assert that the trial court erred by finding that Cotter and Anthony, who were at relevant times minority shareholders, were not in privity with the corporations, by finding no genuine issue of fact as to whether Koverman acted with malice, and by finding no genuine issue of material fact as to whether Cotter suffered an injury different than other shareholders. We conclude that the trial court did not err by finding that Cotter and Anthony, as minority shareholders, were not in privity with Koverman's corporate clients. We also conclude that there are no genuine issues of material fact which would preclude summary judgment on the issues of malice and damages.

**I. Washington Assets Sold without Minority Shareholder Cotter's Approval**

{¶ 3} Omega was engaged in the business of industrial machinery moving. The allied company, Hevi-Duty, was a rigging and moving equipment company that leased equipment to Omega. Both companies were closely held corporations, with their corporate headquarters in Dayton, Ohio. In 1991, they began doing work in the State of Washington and Cotter, who had worked for Omega from at least the middle 1980's, eventually moved from Dayton to the Seattle area and ran the West Coast operation. In 2000, Cotter and Anthony, a Seattle businessman who did not work for Omega, each purchased 24.5% of the shares of Omega and 25% of the shares of Hevi-Duty. The

remaining shares were owned by Donald Foreman. The shareholders all executed written Close Corporation Agreements for both Hevi-Duty and Omega, in which Foreman, Cotter, and Anthony were named as officers and directors of both corporations. In both agreements, Foreman was named President of the corporation and Cotter was named Vice-President. In both agreements, Foreman is designated as an employee of the corporation, with the right to certain benefits.

{¶ 4} In early 2003, Foreman began discussions with an independent broker about selling the assets of the Washington division. Koverman provided legal representation to Omega and Hevi-Duty during the negotiations for the sale of the Washington division assets to Morgan Industrial, a Washington competitor. Cotter and Anthony assert, but Koverman denies, that Koverman also represented the personal interests of the majority shareholder, Foreman, during the sale process. The dispute over the sale of the Washington division was submitted to arbitration pursuant to the terms of the close corporation agreements. Depositions taken in that proceeding were submitted or referred to by all parties without objection. Depositions taken in the current litigation were also submitted. Koverman and Foreman testified that since the mid-1990's Koverman had been retained by Foreman to provide legal services to the corporation and to Foreman, personally. In his affidavit filed in support of the motion for summary judgment, Koverman avers that he never acted as Foreman's personal lawyer. Cotter retained and utilized his own lawyers for his personal negotiations to individually purchase the assets of the Washington division.

{¶ 5} In his deposition, Koverman testified that, at the buyer's request, the broker did not initially disclose the identity of the potential buyer, but that Cotter and Anthony

were informed that there was an interested buyer shortly after Koverman received his first letter from Morgan in late February. Cotter claims he did not learn the identity of the buyer or the terms of the buyer's offer until late July, because Koverman insisted that the buyer was requiring confidentiality. Koverman admitted that he wrote a confidentiality agreement and that it was designed to protect Omega's proprietary information and had no terms protecting the buyer's identity or the terms of their offer. Koverman claims that he told Cotter that Omega would provide him with all the same information provided to the potential buyer, that he advised Foreman that they had to tell Cotter about the offer, and that he advised the company's treasurer, Si Page, that they had to provide Cotter with the same financial records given to Morgan. Koverman admitted that he knew Cotter would be interested in making his own offer to buy the assets, and claimed that he told Cotter to get his offer together in March. A fax record established that financial records were sent to Morgan on March 11, 2003, and were sent to Cotter on April 7, 2003. Cotter claims that Koverman did not provide him with enough information to make a competitive offer, because he was not given information about an appraisal of the assets and was not told that the offer included the equipment, the customer lists, and a non-compete agreement. Cotter explained in his deposition that Koverman's failure to give him any details about the Morgan offer led him to believe that it was a bogus or sham offer, which did not need to be taken seriously. Koverman admitted that he did not discuss with Cotter that Morgan wanted to have all shareholders sign a non-compete agreement, because he knew Cotter would not sign it. Koverman also admitted that he was concerned that Cotter would try to "kill the deal" by refusing to sign a non-compete and by trying to buy the assets himself.

{¶ 6} On July 11, 2003, Cotter sent a letter of intent to make an offer to Koverman and Foreman, through his personal Washington attorney, offering to purchase the hard assets for $1.2 million, which he thought was the same price offered by Morgan. Cotter's offer did not include any down payment; he would pay Omega $50,000 per year, with a balloon payment after five years. Koverman admitted that he rejected Cotter's offer and told Foreman the offer was illusory, but could not identify who told Cotter that it was unacceptable. Cotter testified that Koverman did not tell him why the offer was unacceptable, and he had no way to know what was lacking. Koverman admits that when negotiating with Morgan, they rejected offers with any contingencies, because they wanted finality to the sale, and they gave Morgan time to obtain financing. Cotter's offer was also contingent upon financing, but he was not told that was the reason for its rejection, and was not given any additional time to secure his financing.

{¶ 7} According to Koverman, the reasons for selling the Washington division assets were because the Washington division was losing money, the warehouse lease was too expensive, and it was too expensive to move the equipment back to Dayton. A letter from the treasurer, Page, to Morgan indicated that they needed to complete the sale quickly because the warehouse lease was expiring. Koverman admitted that before the sale was finalized, he was able to negotiate acceptable terms for an extension of the warehouse lease. Cotter testified that the Washington division was financially successful, and that he was not given any opportunity to discuss the financial issues before the sale was approved.

{¶ 8} A meeting of the Omega Board of Directors to discuss the sale of the assets

was held on July 25, 2003. At that meeting, Cotter offered a different and more detailed purchase agreement, offering to buy all the fixed assets of both the Ohio and Washington divisions of Omega for $2.4 million, subject to an appraisal, in which case the price could rise to $2.6 million. The offer was subject to financing through Oak Hills Bank, and the purchase price was to be paid in full at closing within 30 days. At the meeting, Cotter brought in an investor, who offered to guarantee the loan, and offered assurance, as a past board member of Oak Hills Bank, that Cotter's loan would be approved.  At this meeting, Cotter first learned that Morgan's offer had been reduced to only $700,000 for the Washington division assets, and $100,000 for a non-compete agreement, subject to financing that would be obtained by the end of the month. Cotter objected, claiming that the Board did not have proper authority to act, because notice of the meeting was defective, so it was agreed to reschedule the meeting. At that initial meeting, Cotter was given a copy of a memo drafted by Koverman, apparently prepared in anticipation of approval of the sale. The memo indicated that if the sale of the Washington division was approved at the meeting, Cotter was to turn in his company truck, credit cards, and cell phone, to not have any contact with the Washington division employees or customers, and to not represent himself as an agent of Omega. After the July meeting, Cotter returned to Washington and discovered that he was locked out of his office, his credit cards were cancelled, and the cell-phone account was terminated.

{¶ 9} On July 30, 2003, Cotter filed a lawsuit in Montgomery County Ohio Common Pleas Court seeking a temporary restraining order to stop the sale to Morgan. On July 31, 2003, a temporary restraining order was issued stopping the sale at that time but the order acknowledged, and did not prevent, a second board meeting, with more

appropriate notice, which was to be held on August 4, 2003. The order scheduled a court hearing on the case for August 5, 2003 that we perceive to be recognition that if the sale was approved at a corporate meeting with proper notice on August 4th, the efficacy of injunctive relief would abate. An agreed order dissolving the TRO was eventually filed August 8, 2003. That order also dismissed Cotter's claims against the corporation and other shareholders pending the referenced arbitration of those claims.

{¶ 10} On August 4, 2003, the sale of the assets of the Washington Division was approved at a combined meeting of the board of directors and the shareholders of both corporations. Before the vote, Cotter asked for an initial vote on whether the sale of the assets was in the best interest of the corporation, but Koverman intervened and did not allow any vote on the "best interest" question. When Cotter's attorney asked the board to vote on the question as to whether accepting the Morgan offer was in the best interests of the corporation, Koverman stated:

No one here is prepared to make that motion. We are not going to get into what is in the best interests. If they vote on this motion and vote affirmatively they certainly believe it's in the best interests, but we don't want to get into a big dialogue about that, that Mike was getting it about, you know, who does this, who does that, because that is so complicated. And that's why we have directors, and if we have four of the five feel that Don should be authorized to enter into this I'm willing to break this down if you want, if you feel it's better to break it down as Pat suggested to several different motions, but one of them certainly will not be best interests because we could argue that until the cows come home. Every time

anybody sells something they believe it's appropriate for them to sell and whoever is buying it believes they're getting a good deal for selling but I don't think we have to get into that. What we're getting into is whether they, the directors, thinks it's appropriate that Don enter into this contract.

Dkt. #33, Transcript of Board Meeting, pgs.33-34.

{¶ 11} Cotter then voiced his specific objections to the sale. Cotter stated that he did not believe the assets were appraised at market value, and that they were worth more than the offer. Cotter believed the list of assets included in Morgan's appraisal was incomplete, and that it did not include any appraisal for the customer lists or any value for goodwill. Cotter also believed that the asset list was missing $300,000 worth of small tools. Cotter believed that the financial statements revealed that the Washington division was in better financial shape than the Dayton division, and that Dayton was running with a negative cash flow. He believed that selling the Washington division and leaving the company with only the Dayton operation was questionable. He also stated that his offer was higher, which would go further to reduce the company debt, provide working capital and potential dividends for shareholders. He also said that he was willing to go further and negotiate a stock swap. In response, Koverman called for a vote on the Morgan offer, without any discussion of Cotter's offer. When the Board approved the president's authority to enter into the contract with Morgan, a second question was posed to give approval to auction the Washington assets and close down the Washington division, if the sale to Morgan was not completed. Cotter argued, and begged to have his offer considered, but Cotter's offer to purchase the assets was not offered for a vote. The board approved the plan to auction the assets and close the Washington division if the Morgan

deal was not completed.

{¶ 12} The Washington division assets were sold for $700,000 to Omega Riggers and Machinery Moving, LLC, a new entity created by Morgan International for the purpose of this transaction. The asset purchase agreement also included a $100,000 payment for a confidentiality, non-disclosure, and non-compete agreement, which prohibited the seller and its affiliates from competing with the buyer for a three-year period. Although there was a written directive about the work Cotter was expected to continue to do out of the Dayton office, neither Foreman nor Koverman responded to Cotter's written inquiry and phone calls about returning to Dayton to continue his job as an employee of Omega. Cotter stayed in Seattle. The week following the sale, Cotter was removed from the payroll of Omega. Cotter's claim for damages included loss of his position with Omega, and the accompanying loss of salary, bonuses, loss of use of a corporate car, an expense account, and health insurance benefits.

{¶ 13} Cotter's claims which had been referred to arbitration pursuant to the corporate agreement, did not include Koverman as a named defendant. After hearing four days of testimony, the arbitrator ruled in favor of Cotter, awarding him $304,224 and attorney fees.

{¶ 14} After receiving the December 29, 2009 arbitration award, Cotter and Anthony brought this separate negligence action against Koverman on December 23, 2010. In its summary judgment decision, the trial court did not consider the transcript of the arbitration proceeding, or other exhibits attached to the plaintiffs' response to the defendant's motion for summary judgment, based on their non-compliance with Civ. R. 56, as unauthenticated documents. We believe the parties have waived any objection to

the deposition testimony; however the conclusions of the arbitrator, rendered in a proceeding in which Koverman was not a party, are inadmissible.

{¶ 15} Foreman, the president of both corporations, died in 2010, and Cotter became the president, and Anthony became the vice-president. More specific facts appear throughout our opinion.

## II. The Course of Proceedings

{¶ 16}   This civil action was initially brought in Montgomery County Common Pleas Court in 2010. The complaint sought damages against Koverman, based on breach of fiduciary duty, legal malpractice, and negligence. Koverman moved for summary judgment. In the motion for summary judgment, Koverman contends that Cotter and Anthony have no standing to pursue a malpractice action against the corporate attorney, that the statute of limitations has passed on any malpractice action, and that the action was not filed in accordance with the requirements of the closed corporation agreement. To support the motion, Koverman relied on his own affidavit, the affidavit of the former treasurer of the corporations, the depositions of Cotter and Anthony and the arbitration evidence. Cotter and Anthony opposed the motion, raising three grounds to support their standing to file the action: 1) that as minority shareholders they were in privity with the attorney's client; 2) that Koverman acted with malice; and 3) that their injuries were not in common with the other shareholder.

{¶ 17}   The trial court sustained the motion for summary judgment in part, and overruled it in part. The trial court considered all claims in the complaint to constitute an action for legal malpractice. The trial court held that Cotter and Anthony could not pursue

an action for legal malpractice against Koverman for three reasons: 1) there was no privity between them and Koverman for legal services; 2) there were no genuine issues of fact to prove that Koverman acted with malice; and 3) Cotter could not establish that his damages were not in common with the other shareholders.[1]  Based on the summary judgment conclusions, all claims made individually against Koverman by Cotter and Anthony were dismissed. The claims made by the corporations were not. From the summary judgment rendered against them, Cotter and Anthony appeal.

## III. Standard of Review

{¶ 18}   We review a trial court's decision on a motion for summary judgment based on a de novo standard of review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "De Novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119-120, 413 N.E.2d 1187 (1980). "Accordingly, we afford no deference to the trial court's decision and independently review the record and the inferences that can be drawn from it to determine whether summary judgment is appropriate." *Bank of New York Mellon v. Bobo*, 4th Dist. Athens No. 14CA22, 2015-Ohio-4601, ¶ 9.

## IV. Appellants' assignment of error

---

[1] It is undisputed that Anthony has no uncommon damages.

{¶ 19} The plaintiffs assert the following as their sole assignment of error:

WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST COTTER AND ANTHONY ON THE BASIS THAT THEY HAD NO ATTORNEY CLIENT RELATIONSHIP WITH THE DEFENDANT BECAUSE THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER THE DEFENDANTS WERE IN PRIVITY WITH THE PLAINTIFFS, AS TO WHETHER THE DEFENDANTS ACTED MALICIOUSLY IN THEIR LEGAL REPRESENTATION AND AS TO WHETHER THE PLAINTIFF, MICHAEL COTTER SUFFERED AN INJURY NOT IN COMMON WITH THE OTHER SHAREHOLDERS.

{¶ 20} Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 29; *Sinnott v. Aqua–Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, 876 N.E.2d 1217, ¶ 29.   The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact for each of the elements of its claim. *Mitseff v. Wheeler,* 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). The Supreme Court of Ohio set out the burdens of proof when considering motions for summary judgment in *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996). The court stated:

[W]e hold that a party seeking summary judgment, on the ground that

the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Id.* at 293, 662 N.E.2d 264.

{¶ 21} We begin our analysis by focusing on the nature and extent of the decision being appealed. The defendants-appellees' motion for summary judgment filed on April 29, 2013 asserted that: (1) plaintiffs' claims pled as breach of fiduciary duty and generic negligence are claims for legal malpractice and should be dismissed to the extent they allege independent claims, (2) the individual plaintiffs, Cotter and Anthony, do not have standing to assert individual claims, (3) the Corporate Boards of the corporate plaintiffs

did not vote to pursue the lawsuit, and the claim was not properly brought as a shareholders' derivative action, and (4) the statute of limitation for legal malpractice has run. The trial court determined that: (1) the plaintiffs' only claims are for legal malpractice, (2) the individual plaintiffs had no attorney-client relationship with the defendants, and no substitute (privity, malice, or uncommon injury) for an attorney-client relationship, (3) that the corporations have authority to pursue the action and, therefore, it was unnecessary for the claim to be filed as a shareholders' derivative action, and (4) there is a genuine issue of material fact as to whether Koverman represented Omega and Hevi-Duty in less than one year before the filing of the complaint, resulting in denial of summary judgment on the statute-of-limitation issue. Of these four determinations, only the second, the lack of an attorney-client relationship or, more precisely, whether there is a substitute for that relationship, has been appealed. We believe the trial court correctly found no genuine issue of material fact as to the existence of a legal substitute.

{¶ 22} A claim against an attorney for actions taken in his professional capacity is a claim sounding in legal malpractice no matter how artfully the pleadings attempt to raise some other claim. "'An action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice * * *, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages. * * * Malpractice by any other name still constitutes malpractice.'" *Pierson v. Rion*, 2d Dist. Montgomery No. 23498, 2010-Ohio-1793, ¶ 14, quoting *Muir v. Hadler Real Estate Mgmt. Co.*, 4 Ohio App.3d 89, 446 N.E.2d 820 (10th Dist.1982). Although the trial court correctly found that the only viable claim is one for legal malpractice, and that conclusion is not on appeal, we reiterate the nature of the claim to

emphasize that the plaintiffs' various claims need to be analyzed in a legal-malpractice context.

{¶ 23} It is undisputed that Michael Cotter and Al Anthony had no actual attorney-client relationship with Koverman, which is an indispensable element for a malpractice claim. There also is no dispute that case law has developed three potential avenues around, or substitutes for, such a relationship: (1) the claimant is so situated that it is deemed in "privity" with the actual client, (2) the attorney acted with malice toward the claimant such that an action for recovery is justified, or (3) the injury or damages caused by a tortfeasor to a corporate shareholder claimant are unique and distinct from those suffered by other shareholders, which justify a direct claim by the shareholder against the tortfeasor.

## V. The privity exception

{¶ 24} Neither the applicable case law nor the facts of this case support the notion that either Cotter or Anthony were in "privity"[2] with Omega or Hevi-Duty, the actual clients of defendant Koverman. "'[A]n attorney is immune from liability to third persons arising from his performance as an attorney in good faith on behalf of, and with the knowledge of his client, unless such third person is in privity with the client or the attorney acts maliciously.'" *Scholler v. Scholler*, 10 Ohio St.3d 98, 103, 462 N.E.2d 158 (1984), quoting *Petrey v. Simon*, 4 Ohio St.3d 154, 157, 158-159, 447 N.E.2d 1285 (1983). In *Scholler*, a

---

[2] The Supreme Court of Ohio defines privity as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter." *Shoemaker v. Gindlesberger,* 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 10 (citing Black's Law Dictionary 8th Ed. 2004).

mother had sued her former attorney, on behalf of herself and her minor son, for the attorney's alleged negligent failure to have obtained child support for the son in her divorce proceedings. The son was not directly represented by mother's attorney so the question arose whether privity between mother and child, a commonality of interest in getting the child support, was a substitute for an attorney-client relationship. *Scholler* cited the general privity principle, but the finding of no privity in *Scholler* demonstrates how very narrow the privity exception is interpreted. *Scholler* held that "an attorney who represents a spouse in the negotiation of a separation agreement does not simultaneously, automatically represent the interests of a minor child of the marriage." *Id* at 104. In other words, there is no privity between mother and child.

{¶ 25} The next often cited case in the "privity" sequence is *Simon v. Zipperstein*, 32 Ohio St.3d 74, 77, 512 N.E.2d 636 (1987). There the attorney had drafted both an antenuptial agreement and a will for a client. The documents could be construed as inconsistent. After the client's death, one of the potential beneficiaries under the will brought an action against the attorney for malpractice because the attorney did not clearly prevent the surviving spouse from taking under both the antenuptial agreement and the will. The trial court had granted a motion for summary judgment for the attorney, concluding that absent privity, the potential heir did not have standing to sue the attorney. This court reversed. But the Ohio Supreme Court then reversed this court. It concluded that a potential beneficiary of a will was not in privity with the testator for purposes of suing the attorney who prepared the will. It also cautioned this court about disregarding the holding of *Scholler* based upon non-distinct "public policy" grounds. *Simon* therefore also reflects how very narrow the privity exception is when there is no attorney-client

relationship in a legal malpractice action.

{¶ 26} Next is *Elam v. Hyatt Legal Services*, 44 Ohio St.3d 175, 541 N.E.2d 616 (1989). There a decedent's will devised a life estate in her real property to her husband with the remainder to her nephews and niece. The attorney for the husband, now executor, unbeknownst to the remaindermen, caused the filing of a certificate of transfer for the property to the husband in fee simple. The remaindermen were able to correct the transfer through the new estate attorney, but the remaindermen then filed suit against Hyatt and their attorney for the costs incurred to correct the problem. Following *Simon*, the trial court found the remaindermen were not in privity with the executor. This court affirmed. But the Ohio Supreme Court reversed, holding that "[a] beneficiary whose interest in an estate is vested is in privity with the fiduciary of the estate, and where such privity exists the attorney for the fiduciary is not immune from liability to the vested beneficiary for damages arising from the attorney's negligent performance." *Id.* at 177. There is a question whether the Supreme Court's distinction between *Elam* and *Simon*, that the affected heirs were vested in *Elam* but not in *Simon*, was factually supported. But there is a clear distinction between the cases. In *Elam*, the failure to correctly distribute the real estate in part to the surviving spouse and in part to the remaindermen was an undisputed error in the transactional process of completing the estate by the attorney. In *Simon*, the alleged error is distinguishable because the manner of how, and to whom, the estate would be distributed was at issue, an error alleged to have been caused by the attorney, who had represented the decedent before his death. At the time of the decedent's representation by the attorney, Simon was only a potential beneficiary of the testator.

{¶ 27} Last in the line of development of the privity exception is *Arpadi v. First MSPCorp*, 68 Ohio St.3d 453, 454, 628 N.E.2d 1335 (1994). There a limited partnership was acquiring an apartment building with the intention of converting it into condominiums. The private placement memorandum distributed to limited partners represented that the mortgage on the building would contain a mortgage release formula whereby early units converted to condos would be released from the mortgage so that cash flow could be generated from early sales to support the conversion of later units. The existing mortgage holders would not agree to the release formula so the attorneys for the partnership, with approval of the president and director of the general partner, unbeknownst to the limited partner investors, drafted the purchase agreement without a release formula. Without the release formula, claimed the limited partners in their lawsuit against the general partner and the attorney, the project failed and went bankrupt. The Ohio Supreme Court framed the question in the case as follows: "The present action involves whether the duty owed by an attorney to exercise due care in the provision of legal services to a partnership extends to the limited partners as well." *Id.* at 456. After reviewing *Scholler, Simon*, and *Elam*, the Ohio Supreme Court held that the duty the attorneys owed to the partnership extended to the individual partners thereof. In so doing, however, the court distinguished a partnership from a corporation, noting that "a partnership is an aggregate of individuals and does not constitute a separate legal entity." *Id.* at 457.

{¶ 28} The foregoing analysis demonstrates that the privity substitute for lack of an attorney-client relationship has been extended only to undeniably-vested beneficiaries of an estate and to the limited partners of a partnership. The exception has not been

extended to minor children affected by representation of a parent in a divorce or to potential beneficiaries of a will. Significantly, there is no Ohio case that has extended the privity concept to allow a shareholder, who does not have a direct attorney-client relationship with corporate counsel, to sue a corporation's attorney for malpractice. We do not believe we should create one.

## VI. The Malice exception

{¶ 29} With respect to the malice issue in the motion for summary judgment, the first question we must decide is whether it is movant's obligation to negate malice in the first instance in their motion or whether it is plaintiffs' burden to demonstrate malice in their response. To prevail on its motion for summary judgment seeking to dismiss a claim, the movant must demonstrate the absence of a genuine issue of material fact on the essential elements of the non-moving party's claims. "The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied." *Sayyah v. Cutrell*, 143 Ohio App.3d 102, 112, 757 N.E.2d 779 (12th Dist. 2001), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

{¶ 30} In this case we believe once the defense demonstrates a lack of an attorney-client relationship, the burden falls to plaintiffs to demonstrate malice as an

exception. The first element of a legal-malpractice case is that there exists an attorney-client relationship. Defendant Koverman's affidavit states: "I never represented Michael Cotter and Al Anthony." (Koverman Affidavit ¶ 5). There is no evidence to the contrary. We conclude this is sufficient to place the burden on the plaintiffs to demonstrate an exception to the general rule, or at least that there is a genuine issue of material fact as to whether an exception exists, and therefore the plaintiffs had the burden of presenting evidence that malice substituted for the lack of an attorney-client relationship.

{¶ 31} The previously-addressed cases of *Scholler*, *Simon*, and *Arpadi*, by quotation of *Scholler*, all pay lip-service to the concept that an attorney who acts maliciously may be sued for malpractice by a non-client, but there is little Ohio case law identifying what set of facts is necessary to constitute malice as a substitute for an attorney-client relationship. Both parties cite the ordinary definition of malice that has been developed and used to determine whether punitive damages are recoverable. "Malice" means "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). Both appellants' merit and reply brief highlight the second part of the definition about a "conscious disregard," apparently recognizing that evidence of hatred, ill will, and revenge is lacking here. Indeed, a review of the materials submitted for the Civ.R. 56 motion fails to demonstrate a genuine issue that any of these elements exist. Thus, only the conscious-disregard prong of *Preston* is being argued.

{¶ 32} In the context of a legal-malpractice action, resolving whether an attorney's

actions could be construed as "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm" requires a subtle, but indispensable, distinction regarding applicable facts. An attorney should not suffer potential liability to third parties for advising and pursuing a client's non-criminal goals, even if those goals will subject the client to potential civil liability. If Omega, by direction of Foreman, its majority shareholder and president, intentionally decided to freeze out Cotter and Anthony, and Koverman was engaged to handle the legal process to do so, Koverman would not be liable in malpractice to the minority shareholders even though those facts arguably could be construed as the majority shareholder's conscious disregard of others' rights that probably would cause substantial harm, and even though those facts would expose the corporation and its majority shareholder to damages from the freeze out, as it did here. To hold otherwise would mean no attorney could advise a client about, or legally participate in, the freeze out of a minority shareholder without incurring malpractice liability. But that is not the law. Ohio has not recognized a direct cause of action against an attorney who represents an entity in a freeze out by the minority who lost in an internal dispute. Other states that have recognized a claim directly against attorneys who assisted a business freeze out have done so on a breach-of-fiduciary-duty theory. *See, e.g.*, *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 514, 309 N.W.2d 645 (Mich. App. 1981). But as previously stated, in Ohio, a claim against an attorney acting in his professional capacity is a malpractice claim. Ohio does not recognize an independent claim for breach of fiduciary duty against an attorney acting in his capacity as attorney and counselor.

{¶ 33} Appellants argue "that there is *at least* a genuine issue of material fact as

to whether Koverman acted in the interests of the majority shareholder and to the detriment of the minority shareholders and the corporations with regard to the Morgan sale and the termination of Cotter." (Reply brief at 17). That completely misses the point. Koverman's obligation was to pursue the goals of the corporation, which in this case were those directed by the president and adverse and inconsistent with those of Cotter, a minority shareholder.

{¶ 34} It is readily apparent that Donald Foreman, for whatever reasons, was bound and determined to cause the acceptance of the Morgan purchase. Cotter himself testified regarding the August board meeting: "They had their minds made up before they went in the room." (Cotter Arb. Depo. Vol III at 344). With regard to the board meetings, he said: "I believe the procedure was appropriate but the sale was not." (Cotter Arb. Depo. Vol I at 95). Foreman was in the driver's seat. He would not have taken Cotter's offer whether the attorneys were involved or not. (Foreman Arb. Depo. June 8, 2006 Vol I at 122). An attorney's actions for a corporation, as directed by the president and majority shareholder, do not constitute malice. In our view, there needs to be something extraordinary, perhaps unethical conduct or conduct on the verge of fraud, before an attorney's conduct in furtherance of his client's goals could support a reasonable inference of malice. Moreover, the issue here is not whether the *corporation's* claim against Koverman is viable. Whether the time to bring that claim has expired, or whether his actions were negligent, in that they harmed the corporation by not getting top-dollar for the sold assets, or whether that claim is otherwise legally viable, has yet to be decided. The only issue before us is whether the minority shareholders have a substitute for the acknowledged lack of an attorney-client relationship.

{¶ 35} In our opinion, malice, as a substitute for an attorney-client relationship, cannot be predicated on actions by the attorney that the attorney is permitted to take, or even negligently may take, as part of the representation of plaintiffs' adversarial client. To constitute malice, the actions of the attorney must include a disregard of rights that the attorney, not the client, is required to protect and must include harm beyond that which legal action necessarily may inflict. In most circumstances, an attorney is not obligated to protect the rights of an adversary. Undoubtedly, every lawyer who throws a family out into the cold in the dead of winter by pursuing a forcible-entry-and-detainer action has a great probability of causing harm. That scenario does not result in malpractice liability. Therefore, in our view, to constitute malice as a conscious disregard for the rights of others causing substantial harm that will suffice to substitute for an attorney-client relationship, facts must exist that demonstrate extra-legal activity.

{¶ 36} Appellants cite two legal-malpractice cases in their discussion about what constitutes malice. Neither is of much assistance here. In *LeRoy v. Allen, Yurasek & Merklin,* 114 Ohio St.3d 323, 2007-Ohio-3608, 872 N.E.2d 254, Mary Elizabeth Behrens died on May 1, 2002. She was the matriarch of the Behrens family and had been the principal shareholder in Marysville Newspapers, Inc., a family-owned, closely-held corporation. Before her death, she had owned 63 shares of the corporation, son Dan owned 30, daughter Julie owned 30, and daughter Mary Miller had 20 shares. Six months before the mother's death, her former will was replaced by a new one. One month later, all of her Marysville Newspapers stock was transferred to a grandson, the son of her son Dan. Her other two children, Julie and Mary, were unaware of the will change or stock

transfer until after her death. The law firm of Allen, Yurasek & Merklin prepared the new will and transferred the stock. A complaint was filed against the attorneys, alleging that Mary Behrens was suffering from dementia, that her son and grandson orchestrated the new will and transfer of the stock, that the attorneys improperly participated in conflicts of interest by representing Mary, the corporation, the son, and the grandson at the same time, and that they colluded with the son and grandson to apply undue pressure on the decedent. The complaint specifically pled that there were special circumstances that constituted the malice exception under *Simon*. The trial court dismissed the complaint on a Civ.R. 12(B)(6) motion. The court of appeals reversed. The Ohio Supreme Court, focusing on the very narrow issue of whether the complaint stated a claim under the malice exception, recognized that the allegations of a complaint must be accepted as true. The Appellants' quote from the case, that "collusion and conflict of interest fall within the ambit of malice" (Appellants' brief at 22), is incomplete and out of context. The more correct quote, considered in context of the court's "examination of the entirety of the complaint," is that "allegations of collusion and conflict of interest fall within the ambit of malice based on the sum total of the underlying facts alleged." Because this case was only dealing with a motion to dismiss a complaint that alleged facts that specifically included an allegation that the circumstances constituted malice under *Simon*, the case is of little assistance in defining what facts must be presented to raise a genuine issue as to the existence of malice when ruling on a summary-judgment motion.

**{¶ 37}** Even less assistance is provided by Appellants' other malice case, *Kelley v. Buckley*, 193 Ohio App.3d 11, 2011-Ohio-1362, 950 N.E.2d 997 (8th Dist.), where the widow of a law firm's deceased former client brought a legal-malpractice action,

individually and as executor of her husband's estate, against the firm. Without question there were attorney-client relationships. "[O]ver the next nine years, Brent Buckley and the Buckley firm represented both herself and her late husband and K & F [deceased husband's limited law partnership] on a wide variety of legal, business, and personal matters." *Id.* at ¶ 4. The discussion about malice, which Appellants quote (Appellants' brief at 22), had to do with whether the widow or the estate could claim punitive damages in the case as a result of conflicts of interest and concealing documents and information from the law firm's own direct client. As such, the discussion of malice in *Kelley* is tangential to evaluating whether the facts of this case constitute malice as a substitute for the lack of an attorney-client relationship.

{¶ 38} On pages 23-24 of their brief, Appellants refer to a series of paragraphs of circumstances that they argue constitute evidence of malice. We disagree, first because some refer to findings or facts noted by the arbitrator, whose decision is inadmissible. Koverman, although a witness, was not a party to the arbitration. His liability, or his personal defenses, were not in question there. It was the actions of Omega and majority shareholder Don Foreman, personally, which gave rise to liability at the arbitration.

{¶ 39} Our review of the record reveals that as of Cotter's June 9, 2006 deposition, three years post-sale, he did not have any basis to believe that anyone expressed ill will toward him. (Cotter Arb. Depo. June 9, 2006, Vol II at 192). With regard to the board meeting, he said: "I believe the procedure was appropriate but the sale was not." (Cotter Arb. Depo. Vol I at 95). Al Anthony's only suggestion of malice before the trial court comes from his deposition, taken June 27, 2012 after nine years of litigation. There Anthony testified his singular evidence of malice on behalf of Koverman was that Koverman, in

Anthony's opinion, lied to them (he and Cotter) about the price offered by Morgan for the West Coast assets falling from $1 million to $700,000 as a result of Cotter's refusal to sign a non-compete agreement. (Anthony Depo. at 121). When, after nine years of litigation, Cotter was asked what evidence he had that Koverman acted with ill will toward him, Cotter stated that Koverman and his firm did not act in the best interest of the business because they could have gotten more money from the sale. (Cotter Depo. June 26, 2012 at 226). When Cotter was pressed further on the issue of malice, the following exchange took place:

> Q.   -- but do you have evidence, other than your opinion that they did not act in your best interest, do you have evidence that Mr. Koverman, Mr. Smith, or the entity Koverman & Smith as it's been named in the complaint actually had a vendetta against you and acted with disregard to your rights or otherwise with malice or with an intent to harm you?
>
> A.   I -- not that I can think of.

*Id.* at 226-227.[3]

{¶ 40} Plaintiffs' sum total of evidence of malice, then, is Anthony's opinion that Koverman lied about the reason for the reduction in purchase price. That price reduction came just days before the first board meeting where the Morgan deal was discussed. The uncontradicted evidence is that Foreman, who did most of the negotiations together with the comptroller, Si Page (Foreman Arb. Depo. Vol II at 165), accused Cotter at the July 23, 2003 meeting of costing the corporation $300,000 (the difference between the prior

---

[3] Cotter went on to complain about the bills for attorney fees charged by Koverman as an additional indication that Koverman was not acting in the best interest of the corporation, but he did not relate that criticism to malice.

offer and the reduced price) because Cotter would not agree to sign a non-competition agreement. Indeed, in Morgan's first written contact with Koverman, the February 28, 2003 letter (Koverman Arb. Depo. Exhibit 64), Morgan expressed concern that "we were apprehensive when we learned yesterday * * * you have no key management/employee noncompete agreements with your staff in Seattle." (*Id* at 1). Around the time of the late price reduction, Koverman was informed by either Skidmore (attorney for Morgan) or Foreman that the price reduction was "because Cotter would not sign a non-compete they would not pay the million dollars." (Koverman Arb. Depo. at 116). Cotter acknowledged that at that board meeting, Foreman was upset with him and said that Cotter had just cost them a bunch of money. (Cotter Arb. Depo. Vol. 1 at 151). There is no evidence that Koverman initiated or created the tie between the price reduction and the non-compete agreement and, therefore, no evidence to support Anthony's opinion that Koverman created or perpetrated a lie. Finally, assuming that Koverman became aware that Morgan recently obtained an appraisal valuing the assets around $700,000, and assuming that Morgan expressed to Koverman the conclusion that Morgan's price drop was because of the appraisal, rather than the lack of a non-compete agreement, in our view it makes absolutely no difference to the outcome of the meetings. Cotter himself testified that he learned of this Morgan appraisal at least by the August 4, 2003 board meeting and perhaps earlier. (Cotter Mont. Co. Depo. at 142). That means the plaintiffs' opinion of a Koverman misrepresentation is legally insufficient to infer that malice had anything to do with the transaction. And without malice involved in the transaction, there is no reason to deviate from the general rule requiring an attorney-client relationship.

{¶ 41} Despite the fact that the principals involved have no evidence, or inference,

of malice, counsel argues that malice is indicated because Cotter was not informed of the name and offer terms from the unknown buyer. Regardless of whether the written confidentiality agreement prohibited disclosure to Cotter, it is undisputed that Foreman, president of the corporation, told Koverman that the potential buyer, Morgan, had requested that Cotter not be informed about negotiations. (Foreman Arb. Depo. Vol. I at 110). Foreman related to Koverman that Morgan did not want employees or customers to be notified until Morgan was ready to talk to personnel. (Koverman Arb. Depo. Vol. II at 73). Eventually, Morgan "had no interest in hiring Mike Cotter." (Foreman Arb. Depo. Vol. II at 155). To reiterate, assuming these actions are against the best interest of the corporation to get the best price, or against the adverse interest of the minority shareholder, and assuming these actions may support negligent behavior or breach of duty by the majority shareholders or of the corporation, it does not create a reasonable inference of malice by the attorney.

{¶ 42} Appellants also argue that malice can be inferred because Koverman failed to consult Cotter about the value of the West Coast assets, failed to get an independent appraisal for Omega, and discouraged discussion of whether the Morgan deal was in the best interest of Omega. These circumstances may be allegations of negligence, but they neither demonstrate malice nor support a reasonable inference of malice. Appellants continue that Koverman failed to return their phone calls, albeit rightfully so in our view. Cotter was represented by an attorney in Washington and attorneys in Dayton who had filed suit and had obtained a later-dissolved TRO to prevent the sale. As such, Koverman's communications should have been to opposing counsel.

{¶ 43} Ultimately, after reviewing more than 1,200 pages of deposition testimony

and reviewing numerous exhibits, we agree with the trial court that there is no genuine issue of material fact and there is no evidence that malice exists to substitute for the lack of an attorney-client relationship between Koverman and Cotter and Anthony.

## VII. Uncommon damage

{¶ 44} Appellants cite *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989), and *Adair v. Wozniak*, 23 Ohio St.3d 174, 492 N.E.2d 426 (1986), for the purported proposition that a shareholder has a claim against a corporate attorney for malpractice if the shareholder's injury is uncommon with other shareholders. Neither of the cases stands for that proposition. The syllabus in *Adair* states: "A plaintiff-shareholder does not have an independent cause of action where there is no showing that he has been injured in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed towards the corporation." *Adair* at syllabus. In that case, Adair and the other officers of Houk Machine Co. Inc., and their wives, directly sued defendants Wozniak, Monteith, and First National Bank for conspiracy to defraud related to a scheme for a sale, loans, and lease-back of Houk Machine's equipment. The scheme failed and Houk Machine filed for bankruptcy. The *Adair* court held that the claim is that of the corporation, not of the shareholders. The case does not address legal malpractice at all.

{¶ 45} The pertinent holding of *Crosby* is that minority shareholders injured by a breach of fiduciary duty owed to them by the majority have a direct cause of action against the majority and need not pursue the claim as a derivative action. In *Crosby*, the allegations generally were that the majority depleted distributions from the corporation by

paying themselves unreasonable salaries, expending money for personal expenses, and taking improper low-interest loans. The case does not address legal malpractice at all. Assuming for the moment that the holdings of *Adair* and *Crosby* do apply here, we agree with the trial court that the uncommon-injury assertion fails completely with respect to Anthony and fails as applied to Cotter. Anthony does not claim any injury separate from other shareholders and, therefore, uncommon injury cannot support his direct tort action against Koverman. With respect to Cotter, he argues that his loss of a job is the uncommon injury he suffered. He testified that he worked for Omega for 18 years. (Cotter Arb. Depo. at 19). He did not become a shareholder until 2000 (*Id.* at 51), so he was an employee for about 15 years before becoming a shareholder. The trial court said it best: "If Cotter is suing as a shareholder, there is no showing that he has suffered an injury from the defendant's alleged malpractice that is different from the other shareholders. If Cotter is suing as a former employee then he has no standing against defendants for legal malpractice." (Order Oct. 21, 2014 at 9). We agree.

### VIII. Cotter was represented by his own counsel

{¶ 46} We would be remiss if we did not note that Cotter was represented by his own counsel during all of the events giving rise to this case. Regardless of our conclusions about privity, malice and uncommon injury, Cotter's representation by his own counsel, and his initiation of litigation over the sale to Morgan, should prevent a malpractice suit against the attorney who represented his adversary. Unlike the *Elam* and *Arpardi* privity cases, and unlike the malice case of *LeRoy v. Allen, Yurasek & Merklin,* where the injured parties were unaware of the legal events that injured them, and they were apparently

unrepresented at the time, there can be no doubt that Cotter was represented by independent counsel throughout. Cotter's "letter of intent" dated July 21, 2003 offering to buy the West Coast assets for $1.1 million with no money down and $50,000 interest payments for five years with a balloon payment after five years (Cotter Arb. Depo. Ex. 38) was faxed to Koverman by Robert Jackson, Cotter's Washington attorney. Cotter also engaged Dayton attorneys who filed a lawsuit against the corporations, and Foreman and Anthony individually, to prevent the sale of the West Coast assets. Cotter was represented by counsel at the August 4, 2003 meeting where the sale was approved. In our view, this independent adversarial representation in the transaction prevents Cotter from asserting that he was effectively "represented" by Koverman and is entitled to sue Koverman for legal malpractice. To conclude otherwise puts Cotter in the position of being able to sue his West Coast and Ohio attorneys for not preventing the sale, and suing the opposition corporate attorney for pushing the sale through. Next he could claim he should be able to sue the attorneys who represented the corporation in the arbitration for costing the corporation substantial attorney fees to prevent him, as a minority shareholder, from obtaining full recovery for his losses.

{¶ 47} The plaintiffs' sole assignment of error is overruled.


## IX. Conclusion

{¶ 48} The plaintiffs' sole assignment of error having been overruled, the judgment of the trial court is Affirmed, and this cause is Remanded for further proceedings on any remaining claims.

WELBAUM, J., concurs.

FAIN, J., dissenting:

**{¶ 49}** I would sustain the plaintiffs' sole assignment of error, reverse the summary judgment, and remand this cause for further proceedings, based primarily upon the following conclusions of law. An attorney is not vicariously liable for the torts of his client, but if the attorney commits malpractice before January 1, 2007,[4] he is liable for injuries to a person in privity with his client proximately caused by his malpractice. *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). A minority shareholder of a close corporation is in privity with a majority shareholder. *Gigax v. Repka*, 83 Ohio App. 3d 615, 615 N.E.2d 644 (2nd Dist. 1992). There is a genuine issue of material fact in this case whether Koverman committed an act or acts of malpractice, before January 1, 2007, that had the proximate result of injuring the plaintiffs.

## I. An Attorney Is Liable for Injuries to a Person in Privity with his Client for Injuries Proximately Caused by his Malpractice

**{¶ 50}** "It is by now well-established in Ohio that an attorney may not be held liable by third parties as a result of having performed services on behalf of a client, in good faith, unless the third party is in privity with the client for whom the legal services were performed, or unless the attorney acts with malice." *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). The Supreme Court of Ohio defines privity as "[t]he connection or relationship between two parties, each having a legally recognized interest

---

[4] For malpractice accruing on or after that date, R.C. 1705.61 or R.C.1701.921 precludes liability to a non-client.

in the same subject matter." *Shoemaker v. Gindlesberger,* 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 10, citing Black's Law Dictionary (8th Ed. 2004). To determine whether privity exists between the parties, the test is not whether the plaintiff is in privity with the defendant-attorney, but must focus on whether the plaintiff is in privity with the attorney's client, with respect to the subject-matter of the legal representation. In the case before us, the key issue is whether Koverman, during his representation of the corporation for the asset sale, also owed any duty to Cotter and Anthony, as minority shareholders of the closely held corporation, based on privity between the minority shareholders and the corporation.

## II. Cotter and Anthony, as Minority Shareholders,
## Were in Privity with the Corporation

{¶ 51} "In the context of legal malpractice, privity between a third person and the client exists where the client and the third person share a mutual or successive right of property or other interest." *CardioGrip Corp. v. Mueller and Smith, L.P.A.*, S.D.Ohio No. 2:06–CV–996, 2008 WL 150000 (Jan. 14, 2008), citing *Sayyah v. Cutrell*, 143 Ohio App.3d 102, 111-12, 757 N.E.2d 779 (12th Dist. 2001). "The interests of the client and the third party must be examined, '[p]rivity exists if the interest of the client is concurrent [i.e., mutuality of interest] with the interest of the third person.' " *Carolina Cas. Ins. Co. v. Sharp*, N.D.Ohio No. 1:10CV02492, 2011 WL 4633869 (Sept. 30, 2011), quoting *Sayyah*, 143 Ohio App.3d at 112, 757 N.E.2d 779.

{¶ 52} In the case before us, the legal question is whether Cotter and Anthony, in their individual capacities or as minority shareholders in a closely held corporation, should

be considered third parties with concurrent or mutual interests with the interests of Koverman's client, the corporation. As acknowledged by Koverman, "the interests of the original attorney-client relationship between the companies and Attorney Koverman relative to the sale was to sell for a reasonable price and under terms that were in the best interest of Hevi-Duty and Omega." Koverman brief, pg. 14. As shareholders, Cotter and Anthony had the same interest as the corporation in completing the sale on the best possible terms. Cotter's personal interest as a potential purchaser of the division is separate and distinct from his interest as a minority shareholder, and need not be considered as part of the privity issue. I agree that from his personal perspective, when Cotter acted to make a competitive bid to purchase the Washington division assets, he was acting in his individual capacity, and his personal interests in that capacity were different than the corporation's interests. Even though Cotter had no privity or attorney-client relationship with Koverman for his personal interest as a potential purchaser, we must also examine whether privity did exist for Cotter's interest as a minority shareholder.

{¶ 53} Cotter urges this court to extend to shareholders of a closely held corporation the holding of the court in *Arpadi v. First MSP Corp.*, 68 Ohio St.3d 453, 628 N.E.2d 1335 (1994), which found that the attorney for a limited partnership stands in privity with the owners of a limited partnership. The *Arpadi* court reasoned that the attorney retained by the general partner owes a similar duty to those with whom the client has a fiduciary relationship, and in a limited partnership the general partner does owe a fiduciary duty to the limited partners. *Id.* at 458. Cotter cites to precedent of this court that has equated the rights of minority shareholders in a closely held corporation to the rights of partners in a partnership. In *Gigax v. Repka*, 83 Ohio App.3d 615, 615 N.E.2d

644 (2d Dist. 1992), we held, "[b]ecause a close corporation strongly resembles a partnership, the participants often consider themselves as partners *inter sese* while obtaining the advantages of the corporate form. This resemblance has permitted courts to venture outside the laws of corporations to borrow from allied disciplines those principles and rules which seem best to comport with the mixed nature of the close corporation form." *Id.* at 620. (internal citations omitted).

{¶ 54} I agree with the trial court that our prior precedent may be abrogated by statutory changes in Ohio business law enacted after our decision in *Repka, supra.* As discussed in *Fornshell v. Roetzel & Andress*, 8th Dist. Cuyahoga Nos. 92132, 92161, 2009-Ohio-2728, statutory changes in 1994 established limited liability companies and limited partnerships as "entities" pursuant to R.C. 1782.01(C). *See also Buckingham, Doolittle & Burroughs, L.L.P. v. Bonasera,* 157 Ohio Misc.2d 1, 2010-Ohio-1677, 926 N.E.2d 375, ¶ 37 (Franklin C.P.) (statutory changes eliminated historical split of authority in which some viewed partnerships as an aggregation of partners while others treated the partnership as an entity separate from its partners). At the time both *Repka* and *Arpadi* were decided, we considered partnerships as a group of individual partners, rather than a separate entity. Subsequent legislation was enacted to clarify that businesses created to limit liability of the individuals who create, own or run the business are considered entities, separate from the individuals involved. *See* Chapters 1776 and 1782 of the Ohio Revised Code.

{¶ 55} Additional changes were enacted in 2006 by amendments limiting the liability of persons providing services to limited liability companies and corporations. R.C. 1705.61 specifically provides that "[a]bsent an express agreement to the contrary, a

person performing services for a member or group of members of a limited liability company owes no duty to, incurs no liability or obligation to, and is not in privity with the limited liability company, any other members of the limited liability company or the creditors of the limited liability company by reason of providing goods to or performing services for the member or group of members of the limited liability company." A similar provision was also enacted in 2006 for persons performing services for a corporation or its shareholders, in R.C. 1701.921, which provides, "[a]bsent an express agreement to the contrary, a person providing goods to or performing services for a shareholder or group of shareholders of a domestic or foreign corporation owes no duty to, incurs no liability or obligation to, and is not in privity with the corporation, any other shareholders of the corporation, or the creditors of the corporation by reason of providing goods to or performing services for the shareholder or group of shareholders." In 2007, a similar provision was enacted under Ohio trust code, R.C. 5815.16, for fiduciaries acting as a trustee or an administrator of a decedent's estate, that provides, "[a]bsent an express agreement to the contrary, an attorney who performs legal services for a fiduciary, by reason of the attorney performing those legal services for the fiduciary, has no duty or obligation in contract, tort, or otherwise to any third party to whom the fiduciary owes fiduciary obligations." Ohio does not have a separate statute for closely held corporations.

{¶ 56} Implicit in the holding of *Fornshell* is the recognition that public policy has changed with regard to the relationship between entities and persons providing services to entities, who are now considered not in privity with the entity or individual members of that entity, unless a written agreement expressly establishes privity. It is not clear whether

the legislature intended the statutory elimination of privity between service providers and business entities for the purpose of limiting liability to apply strictly to liability for breach of contract claims or whether it should also extend to tort claims based on negligent conduct. For an action alleging a lawyer's negligence, these statutes must also be read, *in para materia*, with common law tort principles, and the ethical duties imposed upon lawyers by statute and common law. The Ohio Rules of Professional Conduct establish the professional duties of lawyers licensed in Ohio to perform legal services in a competent, prompt, diligent and loyal manner. To determine the duty owed by an attorney to his client, we have applied the duties set forth under the Rules of Professional Conduct, under limited circumstances. *McCarty v. Pedraza*, 2014-Ohio-3262, 17 N.E.3d 71, ¶ 8 (2d Dist.). We have also recognized that not every violation of the ethical rules constitutes legal malpractice. *Powell v. Rion,* 2012-Ohio-2665, 972 N.E.2d 159 (2d Dist.).

{¶ 57} Guidance on the question of duty owed by the corporate lawyer to third persons, including minority shareholders may be found in Rule 1.2 of the Rules of Professional Conduct,[5] which provides that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is illegal or fraudulent." Comment [11] to Rule 1.2 provides guidance that "where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary." Additional guidance is found in Rule 1.13 of the Rules of Professional Conduct as follows:

> (a) A lawyer employed or retained by an organization represents the

---

[5] The former ethics rules, the Code of Professional Responsibility, in EC 5-19 referred only to a lawyer's allegiance to the entity if the client was a corporation or similar entity, but was broadened to "any organization" by the Rules of Professional Conduct, adopted in 2007.

organization acting through its constituents. A lawyer employed or retained by an organization owes allegiance to the organization and not to any constituent or other person connected with the organization. The constituents of an organization include its owners and its duly authorized officers, directors, trustees, and employees.

(b) If a lawyer for an organization knows or reasonably should know that its constituent's action, intended action, or refusal to act (1) violates a legal obligation to the organization, or (2) is a violation of law that reasonably might be imputed to the organization and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is necessary in the best interest of the organization. When it is necessary to enable the organization to address the matter in a timely and appropriate manner, the lawyer shall refer the matter to higher authority, including, if warranted by the circumstances, the highest authority that can act on behalf of the organization under applicable law.

(c) The discretion or duty of a lawyer for an organization to reveal information relating to the representation outside the organization is governed by Rule 1.6(b) and (c).

(d) In dealing with an organization's directors, officers, employees, members, shareholders, or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.7. If the organization's written consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization, other than the individual who is to be represented, or by the shareholders.

**{¶ 58}** The Comments to Rule 1.13 of the Rules of Professional Conduct recognize that an organizational client cannot act except through its constituents, including officers and shareholders. Therefore, when acting on behalf of a corporation, an attorney will necessarily act under the direction of, and advance the interests of, the controlling shareholder or officer. At least one scholar considering the ethical duties of the corporate attorney toward the minority shareholders in a closely held corporation has advanced the theory that while corporate counsel owes their primary obligation to their corporate client, the lawyer also owes an obligation to third parties to avoid assisting a client in committing fraud or a breach of fiduciary duty, or to avoid negligently failing to stop a client from committing fraud upon a third person, or from committing a breach of fiduciary duty. Leonard E. Gross, *What Duties Does Corporate Counsel Owe to Minority Shareholders in a Closely Held Corporation*, 35 Ohio N.U. L. Rev. 987, 988 (2009). This form of corporate lawyer liability has been referred to as "aiding and abetting the breach of fiduciary duty," as guided by tort principles enunciated in the Restatement (2d) of Torts, §876. Bryan C. Barksdale*, Redefining Obligations in Close Corporation Fiduciary Representation: Attorney Liability For Aiding and Abetting the Breach of Fiduciary Duty*

*In Squeeze-Outs*, 58 Wash. & Lee L. Rev. 551, 554 (Spring 2001).

**{¶ 59}** In response to a certified question from the U.S. District Court for the Northern District of Ohio, the Supreme Court of Ohio chose not to recognize a civil action for aiding and abetting tortious conduct, or to adopt the Restatement (2d) of Torts, § 876. *DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, 132 Ohio St.3d 516, 2012-Ohio-3828, 974 N.E.2d 1194. *See also Sacksteder v. Senny*, 2d Dist. Montgomery No. 24993, 2012-Ohio-4452 (malpractice action dismissed against corporate lawyer for participating in breach of fiduciary duty). Therefore, I conclude that currently Ohio does not recognize a cause of action against corporate attorneys for negligent conduct that aids and abets their corporate client in breaching the client's fiduciary duty to minority shareholders in a closely held corporation. This does not create immunity from liability for corporate counsel for a closely held corporation for his own conduct constituting a breach of duty, if that duty is owed directly to the minority shareholders.

**{¶ 60}** What duty is owed directly to minority shareholders by the attorney for a closely held corporation has not been addressed by any court in Ohio. Prior to the statutory changes in 2006 and 2007, courts have recognized that an attorney for a fiduciary owes a duty to those with whom the client has a fiduciary relationship, and that the resulting relationship constitutes privity between the attorney and the third parties. *Elam v. Hyatt Legal Services*, 44 Ohio St.3d 175, 541 N.E.2d 616 (1989); *Scholler v. Scholler*, 10 Ohio St.3d 98, 462 N.E.2d 158 (1984); *Arpadi v. First MSP Corp.*, 68 Ohio St.3d 453, 628 N.E.2d 1335 (1994); *Brinkman v. Doughty*, 140 Ohio App.3d 494, 748 N.E.2d 116 (2d Dist. 2000); *Dupugh v. Sladoje*, 111 Ohio App.3d 675, 676 N.E.2d 1231 (2d Dist. 1996). In *Arpadi*, the Supreme Court of Ohio recognized:

[T]hat an attorney retained by a fiduciary owes a similar duty to those with whom the client has a fiduciary relationship. In a partnership, the partners of which it is composed owe a fiduciary duty to each other. *See* R.C. 1775.20(A); *Peterson v. Teodosio*, 34 Ohio St.2d 161, 171, 63 O.O.2d 262, 267, 297 N.E.2d 113 (1973). Consequently, in a limited partnership, the general partner owes a fiduciary duty to the limited partners of the enterprise. *A fortiori* those persons to whom a fiduciary duty is owed are in privity with the fiduciary such that an attorney-client relationship established with the fiduciary extends to those in privity therewith regarding matters to which the fiduciary duty relates.

*Arpadi* at 458.

{¶ 61} Ohio courts have recognized a heightened fiduciary duty between majority and minority shareholders when the plaintiff is a shareholder, director, and employee of a closely held corporation. *Morrison v. Gugle,* 142 Ohio App.3d 244, 254-255, 755 N.E. 2d 404 (10th Dist. 2001), citing *Crosby v. Beam,* 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989). "[A] majority shareholder has a fiduciary duty not to misuse his power by promoting personal interests at the expense of corporate interests." *United States v. Byrum,* 408 U.S. 125, 137, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972). "Majority or controlling shareholders breach such a fiduciary duty to minority shareholders when control of a close corporation is utilized to prevent the minority from having an equal opportunity in the corporation." *Crosby* at 109. Absent a legitimate business purpose, such a breach is actionable. *Morrison* at 255. S*teele v. Mara Ents., Inc.*, 10th Dist. Franklin No. 09AP-102,

2009-Ohio-5716, ¶ 21; *Buckingham, Doolittle & Burroughs, L.L.P. v. Bonasera*, 157 Ohio Misc.2d 1, 2010-Ohio-1677, 926 N.E.2d 375, ¶ 36 (Franklin C.P.)

**{¶ 62}** Ohio courts have held that majority or controlling shareholders in a close corporation cannot terminate a minority shareholder-employee without a legitimate business purpose. *Thomas v. Fletcher*, 3d Dist. Shelby No. 17-05-31, 2006-Ohio-6685, ¶ 15, citing *Duggan v. Orthopaedic Inst. of Ohio,* 365 F.Supp.2d 853, 863 (N.D.Ohio 2005); *Gigax v. Repka,* 83 Ohio App.3d 615, 623, 615 N.E.2d 644 (2d Dist. 1992); *Estate of Millhon v. Millhon Clinic, Inc.*, 10th Dist. Franklin No. 07AP-413, 2007-Ohio-7153, ¶ 25.

**{¶ 63}** I conclude that in 2003, when Foreman, as the majority shareholder, initiated action to sell assets of the closely held corporation, which was likely to lead to the termination of a minority shareholder-employee, he had a heightened fiduciary duty to that minority shareholder, and that the attorney retained by the majority shareholder/fiduciary for the corporation owed a similar duty to that minority shareholder, creating privity between the attorney's corporate client and the minority shareholder. Accordingly, the trial court erred by finding that no such privity exists. My conclusion in this case is limited to actions taken by corporate counsel in relation to minority shareholders of a closely held corporation prior to the statutory changes that limit the liability of service providers by eliminating privity between service providers and third persons. Whether privity can be established between a corporate lawyer and a minority shareholder based on tortious conduct occurring after the statutory changes is a legal issue that can only be addressed in a future case.

**{¶ 64}** It may be argued that holding that privity exists in these circumstances results in a corporation's lawyer being unable to represent the corporation without

incurring liability.    But if the lawyer does as Koverman claims to have done in this case – correctly advises his client of its duties to minority shareholders – but the client acts contrary to its lawyer's advice, then there would be no basis for a finding of malpractice. A lawyer who correctly advises his client of the client's legal obligations to others is not vicariously liable if the client ignores his advice and injures the legal rights of others.

## III. There Is a Genuine Issue of Material Fact Whether Koverman Committed an Act or Acts of Malpractice, Before January 1, 2007, that Had the Proximate Result Of Injuring the Plaintiffs

{¶ 65} In support of their motion for summary judgment, Koverman filed the transcript of Cotter's deposition, Dkt. #58. In response to questions asking Cotter to identify damages caused by Koverman's conduct, Cotter identified the following facts:

1) Koverman failed to obtain an independent appraisal of the assets being sold, which Cotter estimates should have been 30 to 40% higher than the Morgan offer.

2) Koverman failed to communicate with Cotter about the details of the Morgan offer, which prevented Cotter from providing input based on his knowledge of the assets, including his own appraisal of the assets. Koverman also misrepresented the truth about his knowledge of the buyer's identity and his ability to disclose it to Cotter, for the purpose of preventing Cotter from taking any action which could interfere with the completion of the sale to Morgan.   The lack of communication caused Cotter to

unnecessarily spend $30,000 to prepare an offer that was never going to be considered.

3) Koverman failed to assure that the Morgan offer included all the assets, including a value for the customer lists, the goodwill, the pending bids and the transfer of employees, which caused the offer to be undervalued.

4) Koverman acted for Foreman in negotiating the sale, without input from Cotter, and directed the course of the shareholders meeting, without allowing consideration of Cotter's offer, thereby diminishing the value of the legal services for which the company overpaid Koverman the sum of $50,000.

5) Koverman's conduct contributed to the company's failure to accept Cotter's offer and end the deal, which caused the company to incur unnecessary attorney fees for many years, and caused Cotter to incur $150,000 in legal fees.

6) Koverman's conduct in directing the company to make the sale with Morgan directly caused a loss of value to his stock, as a minority shareholder of Omega.

7) Koverman failed to stop the sale, and adjourn the shareholders meeting in order to arrange for an independent and complete appraisal of the assets, causing an undervaluation of the assets sold to Morgan.

8) Koverman instructed the company treasurer to close Cotter's expense account company credit cards, and cell phone, prior to the August

4, 2003 meeting, which caused him to personally incur expenses for a plane ticket and travel expenses from Seattle to Dayton to attend the meeting.

**{¶ 66}** In my view, these sworn statements of Cotter are sufficient to establish a genuine issue of material fact whether he and Anthony were injured as a proximate result of Koverman's malpractice.

## IV. There Is Also a Genuine Issue of Material Fact Whether
## Koverman Acted with Malice

**{¶ 67}** Cotter and Anthony contend that their tort claim based on malice or bad faith can proceed against Koverman, even without privity or an attorney-client relationship. It has been recognized that an attorney may be held liable to third parties as a result of performing services on behalf of a client, if the third party is harmed by an act of malice. *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). To prevail on its motion for summary judgment seeking to dismiss the claim based on malice, Koverman must be able to identify those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the non-moving party's claims. "The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied." *Sayyah v. Cutrell*, 143 Ohio App.3d 102, 112, 757 N.E.2d 779 (12th Dist. 2001), citing

*Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

{¶ 68} In the original motion for summary judgment, Koverman does not address the malice claim, and points to no evidence to demonstrate that the plaintiffs cannot prove a claim based on malice. To prove a claim of malice, a party must establish that a person's tortious conduct was done with a state of mind that can be characterized by "hatred, ill will or spirit of revenge," or that the tortious act was done in "conscious disregard for the rights and safety of other persons that has great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987). Therefore, to meet his burden in the summary judgment proceeding, Koverman would need to establish that based on undisputed facts, reasonable minds could not conclude that Koverman acted out of hatred or ill will or consciously disregarded Cotter and Anthony's rights, or that Koverman was aware that his actions had a great probability of causing substantial harm.

{¶ 69} In their complaint, Cotter and Anthony allege that Koverman acted with malice and in bad faith by "improperly advising the Plaintiffs to ignore the offers of Cotter, by serving the interests of Foreman and themselves to Plaintiffs' detriment, by failing to advise and counsel the board of directors of Omega and Hevi-Duty to act in the best interests of the companies and their shareholders." 2d Dist. Montgomery CA No. 25881, Dkt #1. In Koverman's reply memorandum, Koverman attempts to flip the burden of proof to Cotter and Anthony by repeatedly asserting that the plaintiffs have not met their burden of demonstrating a genuine issue of material fact that Koverman acted maliciously. The movant's burden cannot be discharged by "making a conclusory assertion that the nonmoving party has no evidence to prove its case." *Dresher v. Burt,*

75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, then summary judgment must be denied. *Malone v. Lowry*, 2d Dist. Greene No. 06-CA-101, 2007-Ohio-5665, ¶ 10; *Lear v. Hartzell Hardwoods, Inc.*, 160 Ohio App.3d 478, 2005-Ohio-1907, 827 N.E. 2d 840, ¶ 11 (2d Dist.). In other words, unless the movant satisfies its initial burden on a motion for summary judgment, the non-movant has no burden of proof.

{¶ 70} To prevail in his motion for summary judgment, Koverman had the burden of establishing that there was no genuine issue of fact regarding Cotter's claim that he acted with malice. A simple averment that he and Cotter had no attorney-client relationship did not eliminate Cotter's malice claim, as a matter of law, and did not shift the burden of proof to Cotter. To meet his summary judgment burden and establish that he was entitled to judgment as a matter of law, it was Koverman's burden to eliminate not only the privity claim, but also the exceptions to privity, which allow a claim for malpractice even without direct privity. An analogous issue arises in tort cases involving injuries caused by governmental employees, who are generally immune from liability, unless one of the exceptions to immunity applies. *See* Chapter 2744 of the Revised Code. In those cases, when the governmental defendant moves for summary judgment to dismiss the injured plaintiff's claims, the burden is on the movant to establish not only facts triggering the general immunity rule, but also the applicable exceptions to the rule. For example, in cases involving tort liability arising out of a car accident that occurs in the course of a police officer's response to an emergency, courts have correctly required the governmental defendant, when moving for summary judgment, to establish that there is no genuine issue of material fact that the officer was operating a motor vehicle while

responding to an emergency call and that the operation of the vehicle did not constitute willful or wanton misconduct. *Weitzel v. Trumbull Cty. Commrs*, 11th Dist. Trumbull No. 2014-T-0034, 2014-Ohio-5620, ¶ 15; *Bricker v. State Farm Ins.*, 11th Dist. Lake No. 2009-L-087, 2010-Ohio-3047, ¶ 48-49. Similarly, in a slip and fall case against a political subdivision, when moving for summary judgment the governmental defendant had the burden to establish not only that the injury occurred on property used for a governmental function, but also that the injury was not caused by a physical defect on the grounds of that property. *Nicholas v. Lake Cty.,* 11th Dist. Lake No. 2012-L-140, 2013-Ohio-4294, ¶ 21. In the case before us, Koverman failed to meet his burden, as the moving party, to establish that there were no genuine issues of fact regarding all of the alleged grounds for a malpractice claim.

{¶ 71} Even assuming that Koverman did meet his burden of proof, through the depositions and evidentiary support filed in support of his motion for summary judgment, the facts discussed in Koverman's deposition, in comparison to the facts discussed in Cotter's deposition, reveal numerous issues of material fact. Viewing the evidence in a light most favorable to Cotter, the disputed facts from which a trier of fact could infer that Koverman acted with malice include:

1) Koverman, individually, or in concert with Foreman, took no action to assure that all pertinent financial records and pending offers were timely provided to Cotter, with the knowledge that Cotter could not submit a competitive offer without the information.

2) Koverman, individually, or in concert with Foreman, failed to exercise due diligence in obtaining an independent appraisal of the

Washington assets, or to include Cotter in the appraisal process to assure that all assets of the division he supervised were included in the appraisal.

3) Koverman, individually, or in concert with Foreman, failed to adequately consider Cotter's offer to purchase the assets, and failed to communicate with Cotter to specify what his offer was lacking, with the knowledge that the failure to communicate would directly affect Cotter's ability to present an adequate offer.

4) Koverman, individually, or in concert with Foreman, failed to give Cotter adequate time to finalize financing, while additional time was given to Morgan to obtain financing, with the knowledge that Cotter's offer would be rejected if it did not contain approved financing.

5) Koverman, individually, or in concert with Foreman, encouraged Cotter to submit an offer to purchase the assets, when in fact it was already decided that the president had authority and would exercise that authority to sell or auction the assets to a third party in order to close the Washington division, thereby foreclosing any opportunity for Cotter to continue the business in Washington.

6) Koverman, individually, or in concert with Foreman, negotiated a non-compete agreement with the buyer of the Washington assets that would have the effect of blocking Cotter from continuing his work in Washington, causing Cotter to lose his corporate benefits and his job in the company.

7) Koverman misrepresented that the name of the buyer could not

be revealed to Cotter, mispresented the amount of the offer, misrepresented that the buyer had insisted on a non-compete agreement from all the shareholders, misrepresented that the offer was reduced because of Cotter's refusal to sign a non-compete, misrepresented that an offer would not be considered if it contained financing contingencies, and misrepresented the urgency of accepting the offer based on the expiration of the warehouse lease, which had, in fact, been extended.

**{¶ 72}** All of these factual disputes present genuine issues of material fact whether Koverman consciously disregarded Cotter and Anthony's rights, and was aware that his actions had a great probability of causing substantial harm. Therefore, the trial court erred by finding that Koverman was entitled to summary judgment on the tort claim alleging malice or bad faith.

## V. There Are Genuine Issues of Material Fact Whether Cotter's Damages as a Minority Shareholder Were Different from the Damage Caused to other Shareholders

**{¶ 73}** I also disagree with the trial court that Koverman met its burden of establishing that there are no genuine issues of fact material to the issue of whether Cotter's damages as a minority shareholder were different from the damage that may have been suffered by other shareholders.

**{¶ 74}** I recognize that "[a] shareholder, including a shareholder of a closely held corporation, does not have standing to sue where there is no showing that he has been injured in any capacity other than in common with all other shareholders as a

consequence of the wrongful actions of a third party directed towards the corporation." *Opperman v. Klosterman Equip., L.L.C.*, 3d Dist. Mercer No. 10-15-09, 2015-Ohio-4621, ¶ 68, quoting *Adair v. Wozniak*, 23 Ohio St.3d 174, 178, 429 N.E. 2d 426 (1986). Therefore, as a matter of law, an individual shareholder in a closely held corporation has standing to bring an individual action against a third party if he has been injured in a manner that is not in common with all the other shareholders, as a direct and proximate result of the third party's tortious misconduct. *Crosby v. Beam*, 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989); *Weston v. Weston Paper & Mfg. Co.*, 74 Ohio St.3d 377, 658 N.E.2d 1058 (1996).

{¶ 75} In *Crosby*, the Supreme Court of Ohio recognized that a majority shareholder's misconduct in controlling the corporation for his own advantage, without providing minority shareholders with equal opportunities to benefit, is actionable. *Id.* at ¶ 2 of syllabus. The *Crosby* court discussed how the minority shareholder could prove an injury from the misconduct if it involved misappropriations by the corporate directors. *Id.* at 110. The determination of injury requires a factual analysis of the nature and extent of the shareholder's damages that are directly and proximately caused by the misconduct.

{¶ 76} Looking at the evidence in the record, and drawing all inferences in a light most favorable to the non-movants, I conclude that there is evidence from which a reasonable trier of fact might infer that Koverman's actions were directly related to a compensable loss suffered by Cotter. Cotter identified specific damages associated with his role as shareholder, based on the cost of preparing a competing offer to allow the company to consider a more lucrative offer, the lost value of his shares, the costs incurred for attorney fees, the cost of his travel expenses, and the lost use of his company car,

credit cards and cell phone. Genuine issues of fact exist regarding whether Koverman's actions in withholding information, making misrepresentations of fact, drafting the confidentiality and non-compete requirement and directing the shareholders meeting in a manner that excluded consideration of any other option and prevented a discussion or vote on the best interests of the corporations, had an effect on Cotter, unlike the other shareholders, causing him a greater loss than the loss sustained by other shareholders. It is also premature to conclude that Cotter's loss of employment and benefits was an individual loss rather than a loss connected to his position as a shareholder, without a factual record establishing that no genuine issue of material fact exists regarding the terms of Cotter's employment and his entitlement to financial benefits. In the case before us, the movants did not establish that Cotter's employment and his entitlement to benefits was unconnected to his position as a shareholder, or that his job loss or loss of financial benefits was not directly and proximately caused by any action of Koverman. All of these potential claims for unique damages present genuine issues of material fact. Therefore, Koverman did not meet his burden as the moving party, and summary judgment should not have been rendered in Koverman's favor.

## VI. Conclusion

{¶ 77} I would sustain the plaintiffs' sole assignment of error, reverse the judgment of the trial court, and remand this cause for further proceedings.

. . . . . . . . . . . . .

Copies mailed to:

James M. Hill

Neil F. Freund
Lindsay M. Johnson
Hon. Charles Sheldon Wittenberg
(sitting by assignment)
Hon. Guy C. Guckenberger
(sitting by assignment)